IN THE UNITED STATES DISTRICT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JOHN THOMSON, | : | |
| | : | |
| Plaintiff | : | CASE No. 1:23-cv-00099-SEB-MG |
| | : | |
| v. | : | Judge Sarah Evans Barker |
| | : | |
| ROCHE DIAGNOSTICS CORPORATION, | : | Magistrate Judge Mario Garcia |
| | : | |
| Defendant. | : | |

**DEFENDANT'S MEMORANDUM IN SUPPORT
OF MOTION FOR SUMMARY JUDGEMENT**

## I.   INTRODUCTION

Plaintiff John Thomson ("Plaintiff") retired from his employment with Defendant Roche Diagnostics Corporation ("Defendant" or "Roche") in January 2023. Plaintiff does not challenge his retirement in this lawsuit. Rather, as a sales employee over the last thirty-five years of his Roche employment, Plaintiff was eligible for a base salary and incentive compensation through a Roche policy, RDC-107, Roche's Incentive Compensation Plan (the "ICP"). (Exhibit A – Defendant's Appendix p. 10, Deposition of Plaintiff John Thomson at 13 (hereinafter "Appx. p. _, Dep. Plaintiff at _").

The ICP provides for two forms of incentive compensation: (1) Group compensation that is objectively based on sales and profits; and (2) individual, non-quantitative performance compensation referred to as Key Sales Objectives ("KSO"). This lawsuit addresses the KSO payments.

Plaintiff admits that he received KSO payments twice a year and he reviewed the payments with his supervisor each time that he was paid a KSO payment. (Appx. p. 22-24, Dep. Plaintiff at 34-36). Plaintiff further admits that he received and read RDC-107 each year at issue in this

lawsuit.  (Appx. p. 27, Dep. Plaintiff at 39).  Relevant to this lawsuit, RDC-107 set forth clear timelines and procedures for employees to raise issues regarding KSO payments.  (Appx. pp. 44-48, Dep. Plaintiff at Exs. 1, 3, 5, 7, and 9).  In 2018, Plaintiff disputed his KSO payment and Roche made a correction.  (Appx. pp. 29-30, Dep. Plaintiff at 42-43).  However, Plaintiff admits that he failed to timely or properly dispute the KSO payments after 2018.  (Appx. pp. 29-30, Dep. Plaintiff at 42-43).

As set forth below, the undisputed facts firmly support summary judgment in favor of Roche on all claims asserted by Plaintiff for three, independent reasons.  Initially, the Parties agree that Indiana law applies to Plaintiff's claims.  (Doc. #57, pgs. 6-7).  Under Indiana law, an employer policy, like RDC-107, cannot support a unilateral contract claim asserted by an employee.  *Orr v. Westminster Village North, Inc.*, 689 N.E.2d 712, 719-720 (Ind. 1997).  In fact, the Seventh Circuit recently recognized and confirmed Indiana law in 2023.  *Alley v. Penguin Random House*, 62 F.4th 358 (7th Cir. 2023) ("It is unclear whether an employee handbook could ever constitute a unilateral contract and bind an employer under Indiana law").

The second reason why summary judgment should be granted in favor of Roche is because Plaintiff admits that he failed to exhaust his administrative remedies under RDC-107.  Accordingly, under Indiana law, if RDC-107 is a unilateral contract enforceable by Plaintiff, he has an obligation to first exhaust his administrative remedies under the contract prior to filing this lawsuit, and he has not done so.  *Orr*, 689 N.E.2d at 721-722.

Finally, the facts firmly support that the bonus payments Plaintiff received under the Key Sales Objective of RDC-107 were appropriate and firmly supported by Plaintiff's work performance.  In fact, Plaintiff does not argue that his actual work performance from 2018 through 2022 warranted higher payments under RDC-107.  Rather, Plaintiff is asking this Court to award

him the highest possible payments under the KSO based solely on his position that the KSO process did not comply with RDC-107.  In simple terms, Plaintiff wants to enforce the portions of RDC-107 that benefit him and is asking this Court to ignore the facts and portions of RDC-107 that confirm he was paid KSO payments that outpaced his work performance.  Accordingly, for these three reasons, summary judgment should be granted in favor of Defendant on all claims asserted by Plaintiff and this matter should be terminated.

## II.  <u>STATEMENT OF MATERIAL FACTS NOT IN DISPUTE</u>

The facts in this matter are simple and straightforward.  Plaintiff's deposition confirms the lack of a genuine issue of material fact for trial.  In addition to Plaintiff's deposition, this factual statement relies on the Depositions of Jason Fowler and Ron DiNizo.  All three depositions are consistent on the material facts.

### A.  <u>Plaintiff Had A Long And Successful Tenure With Roche</u>.

Plaintiff was employed by Roche for over forty-three years.  (Appx. p. 7, Dep. Plaintiff at 10).  Plaintiff announced his retirement on August 31, 2022.  (Appx. p. 16, Dep. Plaintiff at 25).  Plaintiff retired after this lawsuit was filed on January 16, 2023.  (Appx. p. 5, Dep. Plaintiff at 7).  Plaintiff admits that his retirement was voluntary and he is not asserting any claims in this lawsuit based on his retirement.  (Appx. p. 5, Dep. Plaintiff at 7).

As a long-term Roche employee, Plaintiff admits that he had access to and was familiar with Roche's policies and procedures.  (Appx. p. 15, Dep. Plaintiff at 18).  Relevant to this lawsuit, Plaintiff readily agreed that he was aware of Roche's complaint procedures.  (Appx. pp. 14-15, Dep. Plaintiff at 17-18).  Plaintiff knew that he could raise workplace questions, disputes, and complaints with his manager and, if the issue was not resolved, to Roche's Human Resources Department.  (Appx. pp. 14-15, Dep. Plaintiff at 17-18).  Finally, Plaintiff admits that Roche had

3

a non-retaliation policy that prohibited managers and supervisors from imposing adverse actions on employees for complaining pursuant to Roche policies.  (Appx. p. 43, Dep. Plaintiff at 84).

**B.    Roche's Incentive Compensation Plan.**

At the time of his retirement, Plaintiff held the positon of Corporate Accounts Director for Group Purchasing Organizations.  (Appx. p. 7, Dep. Plaintiff at 10).  Plaintiff held this position for at least the last six years of his Roche employment.  (Appx. p. 7-8, Dep. Plaintiff at 10-11).  From 2015 until late 2022, Plaintiff's direct supervisor was Jason Fowler.  (Exhibit B – Defendant's Appendix p. 59, Deposition of Jason Fowler at 15 (hereinafter "Appx. p. _, Dep. Fowler at _")).  In 2018, Fowler's manager was Ron DiNizo, Roche's Vice President of Corporate Accounts.  (Exhibit C – Defendant's Appendix p. 77, Deposition of Ron DeNizo at 15 (hereinafter "Appx. p. _, Dep. DeNizo at _")).

As a sales employee, Plaintiff was paid a base salary.  (Appx. p. 9, Dep. Plaintiff at 12).  In addition, sales employees are also eligible for group and individual incentives under the Incentive Compensation Plan (the "ICP").  (Appx. p. 10, Dep. Plaintiff at 13).  Over the last thirty five years of his employment, Plaintiff was a sales employee who was eligible for incentive compensation.  (Appx. p. 9, Dep. Plaintiff at 12).  Plaintiff admits that he was very familiar with Roche's payment policies because he was eligible for group and incentive compensation under the ICP since 1997.  (Appx. pp. 12-14, Dep. Plaintiff at 14 and 15-17).

The group incentives are entirely objective – based on Plaintiff's department's revenue and profit.  (Appx. p. 10, Dep. Plaintiff at 13).  The individual ICP are referred to as Key Sales Objectives ("KSO").  (Appx. pp. 10-11, Dep. Plaintiff at 13-14).  The KSO are "a non-quantitative measure of performance. . . ."  (Appx. p. 60, Dep. Fowler at 17).  Plaintiff admits that the KSO remained consistent over the years.  (Appx. pp. 24-26, Dep. Plaintiff at 37-38).  The KSO remained

consistent over the years because they were designed to drive performance and sales.  (Appx. p. 81, Dep. DiNizo at 25).  This lawsuit is addressing the KSO payments under the ICP.  (Appx. p. 4, Dep. Plaintiff at 6).

### C.     RDC-107 Set Forth The ICP Policies And Procedures.

RDC-107, the Sales and Service Incentive Compensation Plan Policy, was distributed to "explain common questions and issues" regarding the ICP.  (Appx. p. 44, Dep. Plaintiff at Ex. 1, pg. 2, Section 1.0).  RDC-107 supports the "philosophy of recognizing and paying for the contribution and performance of employees."  (Appx. p. 44, Dep. Plaintiff at Ex. 1, pg. 2, Section 1.0).  Finally, RDC-107 explicitly advises employees to "contact [their] HR Representative to discuss any situations about which you are concerned."  (Appx. p. 44, Dep. Plaintiff at Ex. 1, pg. 2, Section 1.0).

Plaintiff admits that he reviewed RDC-107 on an annual basis.  (Appx. pp. 27, 44-48, Dep. Plaintiff at 39 and Exs. 1, 3, 5, 7, and 9).  Plaintiff received notice of any updated versions of RDC-107 through the Roche learning portal.  (Appx. p. 27, Dep. Plaintiff at 39).  The learning portal would advise Plaintiff that changes may have been made to RDC-107 and he should read and acknowledge it.  (Appx. p. 27-28, Dep. Plaintiff at 39-40).

Relevant to this Motion, from 2018 through 2022, RDC-107 made clear that employees were responsible for reviewing their commission and bonus payments.  (Appx. pp. 44-48, Dep. Plaintiff at Exs. 1, 3, 5, 7, and 9).  In 2018, Section 4.0 of RDC-107 provided:

> 4.0 Incentive Plan Payment
>
> Employees on ICP are responsible for reviewing and confirming the accuracy of their commission and bonus payments.  Within 60 days after the final calendar year-end payout is received, an employee can bring forward, in writing, any discrepancies in calculations for consideration.  After the 60 day period following the calendar year

> final payout, if no issues have been raised by the employee or Roche, the calculation and payment are considered final.

(Appx. p. 44, Dep. Plaintiff at Ex. 1, pg. 9, Section 4).

In 2019 and 2020, Section 4.0 had a similar 60 day review period. (Appx. pp. 45-46, Dep. Plaintiff at Ex. 3, pg. 8; Dep. Plaintiff at Ex. 5, pg. 8). In 2020, Section 10.6 was added to RDC-107 that addressed the resolution of disputes:

> 10.6 Dispute Resolution
>
> Any disputes regarding whether an employee was appropriately compensated in accordance with this policy shall be submitted to such employee's direct manager or supervisor, who shall resolve any such disputes, based on such information as the manager or supervisor deems appropriate, as determined in his or her discretion.

(Appx. p. 46, Dep. Plaintiff at Ex. 5, Section 10.6).

In 2021, the Section 4 review period was reduced to 45 days. (Appx. p. 47, Dep. Plaintiff at Ex. 7, Section 4.0). In addition, the dispute resolution was expanded to include an exception process:

> 10.6 Dispute Resolution
>
> Any disputes regarding whether an employee was appropriately compensated in accordance with this policy shall be submitted to such employee's direct manager or supervisor and through the Payout Exception Process, which shall resolve disputes involving calculations or assignment-of-credit errors in their reasonable discretion. Disputes involving ICP interpretation that could affect compensation of other employees will be resolved by the Payout Exception Process, applying reasonable discretion.

(Appx. p. 47, Dep. Plaintiff at Ex. 7, Section 10.6).

The Payroll Exception Process is very formal. (Appx. p. 92, Dep. DiNizo at 72). The employee's complaint is investigated and then brought to DiNizo and a team to review the investigation and the employee's exception. (Appx. p. 92, Dep. DiNizo at 72). If a Payroll

6

Exception is raised, it is typically an issue like the issues that Plaintiff is raising in this lawsuit. (Appx. pp. 93-94, Dep. DiNizo at 73-74).

In 2022, as in 2021, the Section 4 review period was reduced to 45 days.  (Appx. p. 48, Dep. Plaintiff at Ex. 9, Section 4).   In addition, the expanded Section 10.6 dispute resolution process remained unchanged in 2022.  (Appx. p. 48, Dep. Plaintiff at Ex. 9, Section 10.4).  Section 10.6 directed the employee to raise disputes on compensation through their supervisor or manager and then through the Payroll exception process.  (Appx. p.48, Dep. Plaintiff at Ex. 9, Section 10.4).

In 2018, Plaintiff submitted a written request to change his KSO payment.  (Appx. p. 29 Dep. Plaintiff at 42); (Appx. p. 75, Dep. Fowler at Ex. 4).  In 2018, Plaintiff advised Fowler that he believed his KSO payment was not accurate based on his percentage score.  (Appx. p. 75, Dep. Fowler at Ex. 4).   Plaintiff offered to take the issue to someone beyond Fowler in his written dispute.  (Appx. p. 75, Dep. Fowler at Ex. 4).   However, Fowler corrected the 2018 issue to Plaintiff's approval.  (Appx. p. 75, Dep. Fowler at Ex. 4); (Dep. Plaintiff at 43).  Plaintiff admits that he did not submit a written complaint regarding the KSO payments in 2019, 2020, 2021, and 2022.  (Appx. p. 29-30, Dep. Plaintiff at 42-43).  Plaintiff admits that he never went to Roche's Human Resources Department to discuss the KSO payments or the ICP plan.  (Appx. p. 20, Dep. Plaintiff at 32).  DiNizo does not recall any of the employees that he managed coming to him from 2018 through 2022 to discuss KSO payments.  (Appx. p. 89, Dep. DiNizo at 53).

### D.      The KSO Payments Were Designed To Drive And Reward Performance.

The KSO portion of the ICP was designed to drive and reward good performance.  (Appx. p. 81, Dep. DiNizo at 25).  Plaintiff's supervisor from 2015 through 2022, Jason Fowler, explained the differences between the KSO and the objective, group portion of the ICP:

Q.  Can you give me a quick explanation of what a KSO is?

7

> A.  Typically KSO is a non-quantitative measure of performance for the sales team.  So it's specifically used for the sales team, and it's separate from the sales or profit or placement targets that are quantifiable metrics.

(Appx. p. 60, Dep. Fowler at 17).

Ron DiNizo testified that he would discuss and set business plans with each of his direct reports, including Jason Fowler.  (Appx. p. 82, Dep. DeNizo at 28).  The KSO would then be developed from the business plan.  (Appx. p. 82, Dep. DiNizo at 28).  DiNizo's direct reports would then roll out the KSO to their teams.  (Appx. p. 83-84, Dep. DiNizo at 29-30).  Fowler testified that he would meet weekly with his team through group meetings and one-on-one meetings to roll out and discuss the KSO throughout the year.  (Appx. p. 61, Dep. Fowler at 19).

Plaintiff would receive the ICP at the beginning of the year.  (Appx. p. 21, Dep. Plaintiff at 33).  Upon receipt, Plaintiff would go to the Roche learning portal to acknowledge that he had read and acknowledged receipt of the ICP.  (Appx. p. 22, Dep. Plaintiff at 34).  In addition, Plaintiff admits that his manager would meet with Plaintiff and his team to discuss the ICP.  (Appx. p. 22, Dep. Plaintiff at 34).  The KSO were broad and general.  (Appx. pp. 62-63, Dep. Fowler at 23-24).  For example, in 2021, the KSO for Plaintiff and his team were:  (1) COVID Portfolio support & execution; (2) Strategic engagement with GPO & Key Members; and (3) Engagement with local sales team, utilization of Roche resources.  (Appx. pp. 97-98, Dep. DiNizo at Ex. 20).

Plaintiff admits that the KSO standards remained consistent over the years.  (Appx. pp. 25-26, Dep. Plaintiff at 37-38).  Plaintiff also admits that due to his tenure, he was very familiar with what he needed to do to be successful at Roche.  (Appx. pp. 31-32, Dep. Plaintiff at 61-62).  In fact, Plaintiff admitted that he knew what it took to excel at Roche in his position.  (Appx. p. 32, Dep. Plaintiff at 62).  In Plaintiff's words, "I knew how to be a good employee."  (Appx. p. 33, Dep. Plaintiff at 63).

**E.      Plaintiff Received KSO Payments Twice A Year And Reviewed Them With His Supervisor On Each Occasion.**

Plaintiff was paid the KSO payments on a bi-annual basis.  (Appx. pp. 22-24, Dep. Plaintiff at 34-36); (Dep. DiNizo at 39).  Each time Plaintiff was paid a KSO payment, Plaintiff "would reach out to [his supervisor] to understand why it was paid out in such a way."  (Appx. pp. 22-23, Dep. Plaintiff at 34-35).  On the second KSO payment, Plaintiff would meet with Fowler to discuss the KSO payment and then he would learn the ICP for the following year.  (Appx. p. 34, Dep. Plaintiff at 65).

The KSO were paid on a percentage basis.  (Appx. pp. 86-87, Dep. DiNizo at 42-43).  Most sales employees received a KSO payment that represented 100% of the eligible KSO payment.  (Dep. DiNizo at 42-43); (Appx. p. 67, Dep. Fowler at 44).  Top performers each year would be paid a KSO percentage above 100%.  (Appx. p. 87, Dep. DiNizo at 43).

The first step in the KSO payment process is that each of DiNizo's direct reports assign proposed percentage payments to their teams.  (Appx. p. 85, Dep. DiNizo at 39); (Dep. Fowler at 35).  DiNizo would review the proposed KSO payments across each team that reported to him to verify the payments were fair and driving performance.  (Appx. p. 85, Dep. DiNizo at 39).  At times, DiNizo would speak with his direct reports about potentially changing the proposed KSO payout percentage.  (Appx. pp. 65-66, Dep. Fowler at 36-37).

**F.      Plaintiff Was Paid At Or Near 100% Of The KSO Payments In All Years Except One From 2018 Through 2022.**

DiNizo testified that he was familiar with Plaintiff and that he had a good working relationship with Plaintiff.  (Appx. pp. 78-79, Dep. DiNizo at 17-18).  DiNizo had quarterly interactions with Plaintiff and he was involved in reviewing Plaintiff's work performance.  (Appx. p. 80, Dep DiNizo at 19).  DiNizo believed that Plaintiff was performing at an average level, at

best, from 2018 through 2022.  (Appx. p. 96, Dep. DiNizo at 94).  A major issue that DiNizo saw

in Plaintiff's work performance was a lack of engagement with his sole customer.  (Appx. pp. 90-

91, Dep. DiNizo at 55-56).  In fact, DiNizo received complaints from Roche employees regarding

Plaintiff's engagement with his sole customer.  (Appx. pp. 90-91, Dep. DiNizo at 55-56).

     In 2018, Plaintiff was paid over $42,000 for his KSO payment.  (Appx. p. 75, Dep. Fowler

at Ex. 4).  Plaintiff was paid out at 100% for the first KSO payment and 100.8% for the second

KSO payment.  (Appx. p. 75, Dep. Fowler at Ex. 4).  The original payment was not correct.  (Appx.

pp. 49-50, Dep. Plaintiff at Ex. 11); (Appx. p. 75, Dep. Fowler at Ex. 4).  Plaintiff and his other

three team members all scored close to 100% in 2018.  (Appx. pp. 49-50, Dep. Plaintiff at Ex. 11).

As set forth above, Plaintiff submitted a written complaint in 2018 based on a calculation error.

(Appx. p. 75, Dep. Fowler at Ex. 4).  The written complaint did not address the issues alleged in

this lawsuit.  (Appx. p. 75, Dep. Fowler at Ex. 4).

     In 2019, Plaintiff was paid $37,648 for his KSO payment.  (Appx. pp. 51-53, Dep. Plaintiff

at Ex. 12).  Plaintiff admits that his performance evaluation was poor in 2019 and his percentage

payment was the lowest of his team.  (Appx. pp. 35-26, Dep. Plaintiff at 70-71).  Fowler recalls

that Plaintiff had three "significant missteps" in 2019.  (Appx. p. 68, Dep. Fowler at 60).  Each of

the issues were reviewed with Plaintiff during the course of the year.  (Appx. pp. 68-69, Dep.

Fowler at 60-61).  Plaintiff knew that he could have disputed his KSO payment to DiNizo or human

resources, but he elected not to take the issue beyond Fowler.  (Appx. pp. 36-37, Dep. Plaintiff at

71-72).

     In 2020, due to the COVID-19 Pandemic, Fowler's team did not obtain any new contracts.

(Appx. pp. 70-71, Dep. Fowler at 75-76).  Fowler rated three of the four employees in his

department, including Plaintiff, at 100%.  (Appx. pp. 54-57, Dep. Plaintiff at Ex. 14).  Fowler

recalls that all of the employees in his department, including Plaintiff, were happy with their KSO payments in 2020.  (Appx. pp. 72-73, Dep. Fowler at 77-78).  Plaintiff admits that he could have taken any disputes that he had in 2020 to DiNizo or human resources, but he admits that he did not take the issue beyond Fowler.  (Appx. p. 38, Dep. Plaintiff at 74).

In 2021, Plaintiff was paid a KSO payment of $30,000.  (Appx. pp. 54-57, Dep. Plaintiff at Ex. 14).  Plaintiff was paid out at 100% in 2021.  (Appx. pp. 38-39, Dep. Plaintiff at 74-75).  Plaintiff was paid in the middle of five employees in 2021.  (Appx. pp. 54-57, Dep. Plaintiff at Ex. 14).  Fowler explained that one of Plaintiff's co-workers who was paid a higher amount covered customers for other team members during the course of the year.  (Appx. p. 74, Dep. Fowler at 80).  The second co-worker who was paid more than Plaintiff won a contract that she had been working on for five years.  (74, Appx. p. Dep. Fowler at 80).  DiNizo explained that this co-worker was able to expand Roche's reach in hospitals by 20% due to her new contract and he sought an increased KSO payment to reward her for her excellent performance.  (Appx. pp. 87-88, 95, Dep. DiNizo at 43-44 and 86).  Plaintiff admits that Fowler explained his reasoning for Plaintiff's KSO payment and Plaintiff elected not to take the issue further.  (Appx. p. 40, Dep. Plaintiff at 76).

### G.     Plaintiff Makes The Voluntary Decision To Retire in 2022.

Plaintiff announced his retirement on August 31, 2022.  (Appx. p. 16, Dep. Plaintiff at 25).  Plaintiff made up his mind to retire in early 2022.  (Appx. p. 16, Dep. Plaintiff at 25).  Prior to announcing his retirement, Plaintiff obtained counsel and he approached DiNizo about DiNizo potentially eliminating his positon so Plaintiff could obtain a severance package as part of his Roche retirement.  (Appx. p. 17, Dep. Plaintiff at 26).  Plaintiff admits that he was seeking a "sweetener" to his retirement through the DiNizo discussion.  (Appx. p. 17, Dep. Plaintiff at 26).

Following his retirement announcement, Plaintiff sought to utilize his unused PTO time before officially retiring.  (Appx. pp. 18-19, Dep. Plaintiff at 28-29).   Nonetheless, Plaintiff received a 103% KSO payment for 2022.  (Appx. p. 41, Dep. Plaintiff at 78).  As with prior years, Plaintiff did not take the KSO payment issue beyond Fowler.  (Appx. pp. 29-30, Dep. Plaintiff at 42-43).

Plaintiff filed this lawsuit prior to his official retirement.  Plaintiff alleges that the KSO standards were never developed from 2018 through 2022.  (Appx. p. 4, Dep. Plaintiff at 6). However, Plaintiff admits that the time to raise this issue was early in the year when the ICP plan was rolled out to employees.  (Appx. p. 42, Dep. Plaintiff at 82).   In Plaintiff's words, he "absolutely" should have raised this issue prior to the lawsuit.  (Appx. p. 42, Dep. Plaintiff at 82). Plaintiff does not claim that he outperformed his co-workers, but rather he simply is asking the Court to order Roche to pay him the maximum KSO payment each year, without providing any factual basis that his performance justified the maximum KSO payment.  (Appx. p. 7, Dep. Plaintiff at 10).

**H.     This Court's Recent Order Limited The Remaining Issues.**

On February 15, 2024, this Court issued the Order Granting in Part and Denying in Part Defendant's Motion for Judgment on the Pleadings (the "Order").  (Doc. #72).  Relevant to this Motion, the Order granted judgment in favor of Defendant on all claims accruing before December 12, 2020.  (Doc. #72, pg. 9).  As to the merits, the Order denied Defendant's motion, holding that the factual record was not "fully developed" at the pleading stage.  (Doc. #72, pg. 7).  As set forth above, the depositions have developed the factual record and this Motion addresses the merits of Plaintiff's claims under the 2020, 2021, and 2022 RDC-107 policies.

III.   **LAW AND ARGUMENT**

Plaintiff accepted thousands of dollars in KSO payments from 2018 through 2022.  On one occasion, Plaintiff requested that his KSO payment be increased through a written complaint.  That complaint was accepted and Plaintiff's KSO payment was increased to the amount Plaintiff requested.  Aside from this 2018 complaint that was successful, Plaintiff never asked Roche to review his KSO payments.  Rather, Plaintiff accepted thousands of dollars in KSO payments, retired, and is now asking this Court to act as Roche's Payroll Exception process in order to award him additional KSO payments.  Needless to say, Plaintiff's Complaint is not justified under Indiana law and summary judgment should be granted in favor of Roche on all claims.

A.   **Standard Of Review.**

Summary judgment should be entered if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "The principal function of summary judgment is to prevent unnecessary trials by screening out factually unsupported claims."  *James v. Hale*, 959 F.3d 307, 315 (7th Cir. 2020).

The court may grant summary judgment only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a factual dispute is "genuine"—precluding summary judgment—"only when the evidence could support a reasonable jury's verdict for the non-moving party." *Crawford v. Countrywide Home Loans, Inc.*, 647 F.3d 642, 650 (7th Cir. 2011).  When considering a motion for summary judgment, the court must consider all of the evidence in the record in the light most favorable to the non-moving party and

draw all reasonable inferences from that evidence in favor of the party opposing summary judgment. *Feliberty v. Kemper Corp.*, 98 F.3d 274, 277 (7th Cir. 1996).

> **B**.   **RDC-107 Is A Policy That Does Not Constitute A Contract Under Indiana Law.**

Plaintiff's Complaint is based on his position that RDC-107 represents an enforceable contract.  However, the plain language of RDC-107 provides that the policy was distributed to "explain common questions and issues" regarding the ICP.  (Appx. p. 44, Dep. Plaintiff at Ex. 1, pg. 2, Section 1.0).  RDC-107 supports the "philosophy of recognizing and paying for the contribution and performance of employees."  (Appx. p. 44, Dep. Plaintiff at Ex. 1, pg. 2, Section 1.0).  Finally, RDC-107 explicitly advises employee to "contact [their] HR Representative to discuss any situations about which you are concerned."  (Appx. p. 44, Dep. Plaintiff at Ex. 1, pg. 2, Section 1.0).

Under Indiana law, the "presumption of at-will employment is strong. . . ."  *Orr v. Westminster Village North, Inc.*, 689 N.E.2d 712, 717-718 (Ind. 1997).[1]  The Indiana Supreme Court has rejected the attempt to create a "unilateral contract" through an employee handbook.  *Id.* at 719-720; *McCalment v. Eli Lilly & Company*, 860 N.E.2d 884, 889 (Ind. Ct. App. 2007) ("Under Indiana law, employee handbooks do not constitute unilateral contracts of employment"); *Mart v. Forest River, Inc.*, 854 F.Supp.2d 577, 588-589 (N.D. Ind. 2012) ("Indiana courts have been extremely reluctant to allow employee handbooks[8] to form the basis of a unilateral contract"); *Community Foundation of Northwest Indiana v. Miranda*, 120 N.E.3d 1090, 1100 (Ind. Ct. App. 2019) ("The mere fact that the handbook sets out certain employee policies does not convert the handbook into an employment contract").

---

[1] Plaintiff does not dispute that Indiana law applies to Plaintiff's claims.  (Doc. #57, pgs. 6-7).

Most recently, the Seventh Circuit, in *Alley v. Penguin Random House*, 62 F.4[th] 358 (7th Cir. 2023), confirmed Indiana law on this issue:

> This argument fails. First, for reasons discussed above, Penguin did not retaliate against her for reporting sexual harassment. Second, Alley cannot recover because the Code of Conduct is not an enforceable unilateral contract. A unilateral contract arises when "one party makes an offer (or promise) which invites performance by another, and the performance constitutes both acceptance of that offer and consideration." ***It is unclear whether an employee handbook could ever constitute a unilateral contract and bind an employer under Indiana law***. Even if it could, the handbook would have to contain a "promise clear enough that an employee would reasonably believe that an offer had been made. Alley does not point to any provision in the handbook that is a secure promise of employment. The provision she cites is simply a personnel policy stating that certain behavior is intolerable.

*Id.* at 363-364 (citations omitted) (emphasis added). Based on the Indiana Supreme Court's holding in *Orr* and the Seventh Circuit's recent confirmation of the holding in *Orr*, Plaintiff's attempt to enforce RDC-107 through contract law should be rejected. Accordingly, summary judgment should be granted in favor of Defendant on all claims asserted by Plaintiff.

### C.     If There Is A Contract, Plaintiff Failed To Timely And Properly Raise His Disputes.

If, *arguendo*, RDC-107 is construed as a unilateral contract, Plaintiff's claims still fail because Plaintiff admits that he failed to utilize the complaint procedures available to him under RDC-107. *Orr v. Westminster Village North, Inc.*, 689 N.E.2d 712, 721-722 (Ind. 1997). As set forth above, in 2018, Plaintiff submitted a written request to change his KSO payment. (Appx. p. 29, Dep. Plaintiff at 42); (Appx. p. 75, Dep. Fowler at Ex. 4). It is undisputed that Fowler corrected the 2018 issue to Plaintiff's approval. (Appx. p. 75, Dep. Fowler at Ex. 4); (Appx. p. 30, Dep. Plaintiff at 43). Plaintiff admits that he did not submit a written complaint regarding the KSO payments in 2019, 2020, 2021, and 2022. (Appx. pp. 29-30, Dep. Plaintiff at 42-43). Plaintiff

admits that he never went to Roche's Human Resources Department to discuss the KSO payments or the ICP plan.  (Appx. p. 20, Dep. Plaintiff at 32).

In *Orr*, the Indiana Supreme Court addressed the issue of a plaintiff's failure to exhaust the administrative remedies set forth in the handbook the employee seeks to enforce:

> Moreover, even if the Handbook could be construed as a clear promise sufficient to constitute an offer supporting a unilateral contract, there is a significant question as to whether plaintiffs could argue successfully that the unilateral contract had been breached when they themselves did not comply with the grievance procedures set out in the Handbook. ***A number of cases have held that plaintiffs cannot assert a breach under their asserted employment contract, that is, the employee handbook, and yet fail to follow the grievance procedures set forth in that handbook, procedures that may have provided relief from the asserted unfair treatment or breach***. Stated another way, these cases hold that employees must exhaust their remedies as set forth in the contract or handbook before resorting to the courts. Plaintiffs here have not done so.

*Orr*, 689 N.E.2d at 721-722 (emphasis added); *see also Trimble v. Ameritech Publ'g*, 700 N.E.2d 1128, 1129-1130 (Ind. 1998)(holding as enforceable exculpatory clauses that limit liability); *Am. Gen. Fin. Mgmt. Corp., v. Watson*, 822 N.E.2d 253, 257-258 (Ind. Ct. App. 2005)(enforcing a dispute resolution clause contained in an employment application); *Novotny v. Renewal by Anderson Corp.*, 861 N.E.2d 15, 22 (Ind. Ct. App. 2007)(recognizing the freedom to contract and enforcing an agreement to arbitrate disputes).

In this matter, Plaintiff admits that the time to raise the issues he is raising in this lawsuit was early in the year when the ICP plan was rolled out to employees.  (Appx. p. 42, Dep. Plaintiff at 82).  In Plaintiff's words, he "absolutely" should have raised this issue prior to the lawsuit. (Appx. p. 42, Dep. Plaintiff at 82).  Plaintiff cannot selectively enforce the contract that he seeks to enforce in this Court.  Plaintiff had grievance procedures available to him – the Payroll Exception in 2021 and 2022 – yet he turned to this Court rather than Roche's internal procedures.

16

(Appx. p. 48, Dep. Plaintiff at Ex. 9, Section 10.4); (Appx. p. 47, Dep. Plaintiff at Ex. 7, Section

10.6).  Accordingly, this Court should decline Plaintiff's request that it sit as a super-personnel

department willing to review Roche's KSO percentage decisions.  *Wollenburg v. Comtech Mfg.

Co.*, 201 F.3d 973, 976 (7th Cir. 2000).

> ### D.     The Undisputed Facts Do Not Support Plaintiff's Claim For A Higher KSO Payment.

If this Court were to permit Plaintiff to rely on a unilateral contract and to ignore the

complaint procedures that were available to him under RDC-107, Plaintiff's claims fail on the

merits.  Plaintiff does not allege that he performed at a higher KSO percentage.  (Appx. p. 6, Dep.

Plaintiff at 9).  Rather, Plaintiff is asking this Court to pay him the maximum amount under the

KSO not due to his actual performance, but due to his claim that had he had written KSO provided

to him, that he would have performed at a higher standard.  (Appx. p. 7, Dep. Plaintiff at 10).

DiNizo testified that Plaintiff was performing at an average level, at best, from 2018

through 2022.  (Appx. p. 96, Dep. DiNizo at 94).  A major issue that DiNizo saw in Plaintiff's

work performance was a lack of engagement with his sole customer.  (Appx. pp. 90-91, Dep.

DiNizo at 55-56).  In fact, DiNizo received complaints from Roche employees regarding Plaintiff's

engagement with his sole customer.  (Appx. pp. 90-91, Dep. DiNizo at 55-56).

In 2018, Plaintiff was paid over $42,000 for his KSO payment.  (Appx. p. 75, Dep. Fowler

at Ex. 4).  Plaintiff was paid out at 100% for the first KSO payment and 100.8% for the second

KSO payment.  (Appx. p. 75, Dep. Fowler at Ex. 4).  In 2019, Plaintiff was paid $37,648 for his

KSO payment.  (Appx. pp. 51-53, Dep. Plaintiff at Ex. 12).  Plaintiff admits that his performance

evaluation was poor in 2019 and his percentage payment was the lowest of his team.  (Appx. pp.

35-36, Dep. Plaintiff at 70-71).  Fowler recalls that Plaintiff had three "significant missteps" in

2019.  (Appx. p. 68, Dep. Fowler at 60).  Each of the significant missteps were reviewed with Plaintiff during the course of the year.  (Appx. pp. 68-69, Dep. Fowler at 60-61).

In 2020, due to the COVID-19 Pandemic, Fowler's team did not obtain any new contracts. (Appx. pp. 70-71, Dep. Fowler at 75-76).  Fowler rated three of the four employees in his department, including Plaintiff, at 100%.  (Appx. pp. 54-57, Dep. Plaintiff at Ex. 14).  Fowler recalls that all of the employees in his department were happy with their KSO payments in 2020. (Appx. pp. 72-73, Dep. Fowler at 77-78).  Plaintiff admits that he could have taken any disputes that he had in 2020 to DiNizo or human resources, but he admits that he did not take the issue beyond Fowler.  (Appx. p. 38, Dep. Plaintiff at 74).

In 2021, Plaintiff was paid a KSO payment of $30,000.  (Appx. pp. 54-57, Dep. Plaintiff at Ex. 14).  Plaintiff was paid out at 100% in 2021.  (Appx. pp. 38-39, Dep. Plaintiff at 74-75). Plaintiff's KSO was in the middle of five employees in 2021.  (Appx. pp. 54-57, Dep. Plaintiff at Ex. 14).  Fowler explained that one of Plaintiff's co-workers who was paid a higher amount covered customers for other team members during the course of the year.  (Appx. p. 74, Dep. Fowler at 80).  The second co-worker who was paid more than Plaintiff won a significant contract that she had been working on for five years.  (Appx. p. 74, Dep. Fowler at 80).  DiNizo explained that this co-worker was able to expand Roche's reach in hospitals by 20% due to her new contract. (Appx. pp. 87-88, 95, Dep. DiNizo at 43-44 and 86).  Finally, in 2022, despite taking a significant amount of PTO time, Plaintiff received a 103% KSO payment for 2022.  (Appx. p. 41, Dep. Plaintiff at 78).

In 2021 and 2022, Section 10.6 of RDC-107 was added to include a formal dispute resolution procedure.  (Appx. p. 47, Dep. Plaintiff at Ex. 7, Section 10.6); (Appx. p. 48, Dep. Plaintiff at Ex. 9, Section 10.4).  The Payroll Exception Process is very formal.  (Dep. DiNizo at

72).  The employee's complaint is investigated and then brought to DiNizo and a team to review the investigation and the employee's exception.  (Dep. DiNizo at 72).  If a Payroll Exception is raised, it is typically an issue like the issues that Plaintiff is raising in this lawsuit.  (Appx. pp. 92-93, Dep. DiNizo at 73-74).  Plaintiff admits that he did not submit a written complaint regarding the KSO payments in 2021 or 2022.  (Appx. pp. 29-30, Dep. Plaintiff at 42-43).

Plaintiff admits that the time to raise the issue of wanting a more specific KSO was early in the year when the ICP  was rolled out to employees.  (Appx. p. 42, Dep. Plaintiff at 82).  In Plaintiff's words, he "absolutely" should have raised this issue prior to the lawsuit.  (Appx. p. 42, Dep. Plaintiff at 82).  Moreover, Plaintiff admits that the KSO remained consistent over the years.  (Appx. pp. 25-26, Dep. Plaintiff at 37-38).  Accordingly, Plaintiff's attempt to gain the sweetener to his retirement through this Court should be rejected.  Plaintiff was treated fairly and consistently under RDC-107, and he has no evidence that supports a finding that his KSO payment should be increased due to his job performance.

## VI.    <u>CONCLUSION</u>

Summary judgment should be granted in favor of Roche on all claims asserted by Plaintiff for three independent reasons. The first reason why summary judgment should be granted in favor of Roche is because Indiana law does not support Plaintiff's argument that RDC-107 created a unilateral contract.  *Orr*, 689 N.E.2d at 719-720; *Alley*, 62 F.4th at 363-364.  The second reason why summary judgment should be granted in favor of Roche is because Plaintiff failed to exhaust his administrative remedies under RDC-107.  *Orr*, 689 N.E.2d at 721-722.  Finally, summary judgment should be granted in favor of Roche on all claims because the undisputed facts provide that Plaintiff was compensated under the KSO at a level that exceeded his work performance from

2018 through 2022.  (Appx. p. 96, Dep. DiNizo at 94).  Accordingly, this Court should grant

Roche's motion, in its entirety, enter judgment in favor of Roche, and terminate this matter.

Respectfully submitted,

*/s/ David A. Campbell*
David A. Campbell (0066494)
Gordon Rees Scully Mansukhani, LLP
600 Superior Ave., East 9th Street
Suite 1300
Cleveland, OH 44114
Phone: (216) 302-2531
Fax: (216) 539-0026
dcampbell@grsm.com

*/s/ Hunter T. Edwards*
Hunter T. Edmonds (#37701-29)
Gordon Rees Scully Mansukhani, LLP
600 E. 96th Street, Suite 501
Indianapolis, IN 46240
T: (317) 713-0905
hedmonds@grsm.com

*Attorneys for Defendant Roche Diagnostics
Corporation*

20

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 16th day of February, 2024, the foregoing was filed through the Court's CM/ECF electronic filing system.  A copy of this filing will be sent to all parties through the court's ECF system.

                                                                    */s/ Hunter T. Edmonds*
                                                                    Hunter T. Edmonds