### IN THE UNITED STATES DISTRICT
### FOR THE SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JOHN THOMSON, | : | |
| | : | |
| Plaintiff | : | CASE No. 1:23-cv-00099-SEB-MG |
| | : | |
| v. | : | Judge Sarah Evans Barker |
| | : | |
| ROCHE DIAGNOSTICS CORPORATION, | : | Magistrate Judge Mario Garcia |
| | : | |
| Defendant. | : | |

### DEFENDANT'S APPENDIX OF EVIDENCE IN SUPPORT OF DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Comes Now, Defendant, Roche Diagnostics Corporation, by and through counsel, and files this Appendix of Evidence in Support of Defendant's Memorandum in Support of its Motion for Summary Judgment.

**Exhibit A:**  Deposition of Plaintiff John Thomson, pp. 6, 7, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 25, 26, 28, 29, 32, 33, 34, 35, 36, 37, 38, 39, 40, 42, 43, 61, 62, 63, 65, 70, 71, 72, 73, 75, 76, 78, 82, and 84…………………………………………………………..3-43

Exhibit 1 -- RDC 107_2018 **CONFIDENTIAL, FILED UNDER SEAL**…………………………….. . . . . ………………….44
Exhibit 3 – RDC 107_2019 **CONFIDENTIAL, FILED UNDER SEAL**………………………………………………….45
Exhibit 5 – RDC 107_2020 **CONFIDENTIAL, FILED UNDER SEAL**………………………………………………….46
Exhibit 7 – RDC 107_2021 **CONFIDENTIAL, FILED UNDER SEAL**………………………………………………….47
Exhibit 9 – 2022 RDC_107 **CONFIDENTIAL, FILED UNDER SEAL**………………………………………………….48
Exhibit 11 – CA Summary 2018_Thomson………………………....49-50
Exhibit 12 – CA Summary 2019_Thomson………………………....51-53
Exhibit 14 – CA Summary 2021_Thomson………………………....54-57

**Exhibit B:**  Deposition of Jason Fowler, pp. 15, 17, 19, 23, 24, 35, 36, 37, 44, 60, 61, 75, 76, 77, 78, and 80. . . . . . . . . . . . . . . . . . . . . . . . . . . . ..58-74

Exhibit 4 – 2018 Email ……………………………………………..75

**Exhibit C:**   Deposition of Ron DeNizo, pp 15, 17, 18, 19, 25, 28, 29, 30, 39,
42, 43, 44, 53, 55, 56, 72, 73, 74, 86, and 94 . . . . . . . . . . . . . . . .. .  76-96

Exhibit 20 – 2022 Email………………………………………...97-98

Respectfully submitted,

/s/ David A. Campbell
David A. Campbell (0066494)
Gordon Rees Scully Mansukhani, LLP
600 Superior Ave., East
Suite 1300
Cleveland, OH 44114
Phone: (216) 302-2531
Fax: (216) 539-0026
Email: dcampbell@grsm.com

/s/ Hunter T. Edwards
Hunter T. Edmonds (#37701-29)
Gordon Rees Scully Mansukhani, LLP
600 E. 96th Street, Suite 501
Indianapolis, IN 46240
T: (317) 713-0905
hedmonds@grsm.com

*Attorneys for Defendant Roche Diagnostic
Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of February 2024, the foregoing was filed through the

Court CM/ECF electronic filing system.  A copy of the filing will be sent electronically to all

attorneys of records.

/s/ Hunter T. Edwards
Hunter T. Edwards

Page 1

1               UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF INDIANA
2                  INDIANAPOLIS DIVISION
3             Case Number 1:23-CV-00099-SEB-MG
4
     JOHN THOMSON,                      )
5                                       )
                             Plaintiff, )
6                                       )
           -vs-                         )
7                                       )
     ROCHE DIAGNOSTICS CORPORATION,     )
8                                       )
                             Defendant. )
9
10
11
12
13          REMOTE DEPOSITION OF JOHN THOMSON
14
15
16
17

            The remote deposition upon oral examination
18   of JOHN THOMSON, a witness remotely sworn by me,
     Tara Gandel Hudson, RPR, CRR, a Notary Public in
19   and for the County of Hancock, State of Indiana,
     taken on behalf of the Defendant, with the witness
20   located in Roswell, Fulton County, Georgia, on the
     8th day of September, 2023, scheduled to commence
21   at 9:30 a.m., pursuant to the Federal Rules of
     Civil Procedure with written notice as to the time
22   and place thereof.
23
24
25

```
                                                    Page 6
 1   Q   Finally, if you don't understand my question, if
 2       you need me to explain something, repeat
 3       something, just speak up.  Okay?
 4   A   Okay.
 5   Q   So let me ask you, how's your health today?
 6   A   Very good.
 7   Q   Okay.  And are you on any prescription
 8       medications that could impact your ability to
 9       testify truthfully?
10   A   No.
11   Q   Okay.  Let me ask you, just so I understand it
12       to take some of the issues -- what remedies are
13       you seeking from this lawsuit?
14   A   To be paid for the KSOs that were never
15       developed.
16   Q   Okay.  And that's it?  As to the compensation,
17       aside from maybe your attorneys would make
18       claims for attorney fees or something like that,
19       but from you, your damages specifically, is the
20       KSO from 2018 to 2022?
21   A   Correct.
22   Q   And --
23   A   For me personally, yes.
24   Q   Just so we're clear, you're not alleging or
25       seeking any damages for pain and suffering or
```

Page 7

1    emotional harm or anything like that?

2    A    That is correct.

3    Q    Okay.

4         MR. CAMPBELL:  Anna, is all that correct --

5         I want to make sure I don't have to go into some

6         of the other issues.

7         MS. CONKLIN:  That's correct.  The wage

8         claim statute damages, but no pain and suffering

9         or emotional damages.  That's correct.

10        MR. CAMPBELL:  Okay.  I want to make sure

11        so I didn't have to go through those points as

12        to it.

13   BY MR. CAMPBELL:

14   Q    Mr. Thomson, let me just ask you -- and I guess

15        just finally, you retired from your employment

16        with Roche; right?

17   A    January 16 of this year.  Correct.

18   Q    And that was a voluntary decision?

19   A    Yes.

20   Q    You're not in this lawsuit, you're not alleging

21        that your retirement was in any way unlawful or

22        forced or anything like that?

23   A    That is correct.

24   Q    This is from 2018 to 2022 the KSO, as we call it

25        under the incentive compensation plan; is that

Page 9

1    Q    Okay.  So let me move onto some of the other

2         points as to this.  Let me ask you about the

3         incentive compensation plan.  We're going to go

4         through each of the years and look at it.

5              Have you determined an amount that you are

6         seeking under those years?

7    A    We really haven't -- I would say no.  Not

8         explicitly.  Although -- so when you say for all

9         the years, let me make sure.

10   Q    All or each year.  Either one.

11   A    Anna and I have talked about -- floated numbers.

12   Q    I don't want to know what Anna did -- just to be

13        clear, if you have to say, "I talked to Anna

14        about this or did that," that's something that

15        I'm not entitled to get.  I'm just saying to

16        you, if you have a number as to it, "yes" or

17        "no" as to it.

18   A    No.

19   Q    I don't want to know that you told Anna, Hey, it

20        should be this or that.

21   A    No.

22   Q    You don't know an amount for even like a year or

23        overall, you don't know either one?

24   A    I would say the maximum payout would be the

25        maximum amount.  Yes.  So if I understand your

Page 10

1     question, yes.

2  Q  So it's your position in this lawsuit that you

3     were performing to the level that you should

4     have gotten a maximum payout from 2018 to 2022?

5  A  Well, so I think I know in listening to the

6     depositions of Jason Fowler and Ron DiNizo, if

7     we had KSOs, I do believe I would have.  But we

8     never had KSOs.  So everything was completely

9     subjective.  So yes, I do.  But we never had

10    KSOs.

11  Q  Okay, okay.  Let's go through a little bit.  How

12    long were you employed by Roche?

13  A  43 and a half years, my entire professional

14    life.

15  Q  What was your final position that you held?

16  A  I think they call it a corporate accountant

17    director for GPOs.

18  Q  Say that again so the record is clear.

19  A  Corporate account director, group purchasing

20    organizations.

21  Q  How long did you hold that position?

22  A  Well, I've been involved with group purchasing

23    organizations for approximately 15 years, but

24    there's several of them, and I have been

25    involved in different ones.  This current

Page 11

1       position has been longer -- I'll be honest, I
2       don't recall.  It's been prior to 2018.
3    Q  Okay.  Any idea whether it was five years prior,
4       one year?  Any idea about that?
5    A  It depends on how -- let's see if I understand
6       the question.  Again, I focused at least the
7       last five or six years on Vizient which is the
8       largest national GPO.
9           Prior to that, I did them all by myself
10      during a certain time period.  I also worked
11      with Premier, the second largest GPO.  I worked
12      with Health Trust, the third largest over the
13      course of the last 15 years.  So Vizient, I
14      would estimate to be between five and seven
15      years.
16   Q  Let me ask it this way.  We're going to be
17      talking about the incentive compensation plan
18      during this --
19   A  Yeah.
20   Q  -- deposition.
21          I know you know where I'm going.  Just give
22      it a second for me to complete the question and
23      then you answer.
24          So how long -- how many years prior to your
25      retirement were you eligible to earn additional

Page 12

```
1        compensation beyond your salary under the
2        incentive compensation plan?  Are we talking 15
3        years, 20 years?  How many years were you
4        eligible under that plan?
5    A   So Roche defines it, if I understand your
6        question correctly, how long have I been
7        eligible for some type of incentive pay for -- a
8        sales position was called incentive comp.  For
9        nonsales positions such as marketing positions
10       that I've had, it's called an annual bonus.
11           So are you looking for how long I've been
12       eligible for either one?
13   Q   Why don't you start there.
14   A   35 years, probably.  Estimate.
15   Q   How long were you under the sales side of it?
16   A   Since 2017, I believe.  No, I'm sorry.  I'm
17       sorry.  Correct that.  1997.
18   Q   Okay.  So over 25 years, you were under a -- you
19       were a sales employee governed by an incentive
20       compensation plan?
21   A   Correct.
22   Q   And just so the record is clear, the incentive
23       compensation plan in simple terms, you were paid
24       a salary; right?
25   A   Correct.
```

Page 13

1    Q    And the incentive compensation plan made you

2         eligible for group and individual incentives

3         that paid you beyond your base salary?

4    A    Yes.

5    Q    When we talk about "group," it would be looking

6         at your department or area.  There's some group

7         of employees beyond you that would be purely

8         objective; right?

9    A    Yes.  For things such as revenue, for profit.

10        Yes.

11   Q    Okay.

12   A    Many of us had those metrics, yeah.

13   Q    That would be you and your team, so to say, I'll

14        use for this deposition, that's entirely

15        objective, Did we meet our sales goal?  Did we

16        meet our revenue?  Whatever those are.  And you

17        and the rest of the team members would be paid

18        out under that group incentive; right?

19   A    Correct.

20   Q    The KSO, what does "KSO" mean?  What's that an

21        acronym for?

22   A    Key sales objectives.

23   Q    How long did you have --

24             And the key sales objectives are more

25        individualized; right?

Page 14

1   A   Yes.

2   Q   The key sales objectives, as we heard, are very

3       subjective versus, Hey, you meet a revenue goal

4       of X.  It's more subjective as to, Are you doing

5       your job and going beyond it; right?

6   A   Would not call them subjective.  If you look at

7       the incentive compensation plan, it's supposed

8       to be specific and measurable for the

9       individual.

10  Q   Okay.  So you think it was objective and

11      specific and measurable, is your position?

12  A   Yes.  That's how they are designed.  Yes.

13  Q   Okay.  I just want to have your testimony.

14          So, Mr. Thomson, as to the KSO, how long

15      were you eligible for a KSO?  Was that from that

16      1997 that you had that portion of compensation

17      as part of your incentive compensation plan?

18  A   I don't know if we called them KSOs back then or

19      not.  They used to be called MBOs.  They are

20      some form of measurable and specific metrics

21      that you were to achieve.

22  Q   Let's group them this way.  Since 1997, you had

23      in addition to your salary, you were a sales

24      employee at Roche, and you had in addition to

25      salary, you could earn additional compensation

```
 1      through group incentives; right?
 2    A  Define "group" for me.  Maybe I'm not
 3      understanding that.
 4    Q  We'll certainly look at the plan and your
 5      compensation, but Roche would look at whatever
 6      your department group -- the sales objectives
 7      that we talked about; right?  You talked about
 8      revenue or sales; right?  It wasn't just you?
 9      There was some group or department; right?
10    A  That is correct.
11    Q  Okay.  I'm not trying to be difficult.  I'm just
12      trying to narrow things down.
13    A  I just want to be clear.  Yeah.
14    Q  To be clear, so the first aspect since 1997, you
15      were eligible under the incentive compensation
16      plan that was applicable to you for some
17      group-wide incentive; right?
18    A  Yes.  Depends how you define "group," but yes,
19      I've been in corporate accounts since 1998.  So
20      yes.  If that's the group you're referring to,
21      yes.
22    Q  Okay.  Let's make it simple for you so we don't
23      have to have a dispute later on.
24         The group would be your corporate accounts;
25      is that what you're saying?  They would look at
```

Page 16

```
 1        the corporate accounts, employees, to see if you
 2        met the overall revenue or sales goals or
 3        increase from the prior year; right?
 4   A    Yes.
 5   Q    So since 1997, you said you moved in in 1998
 6        into the role.  For about 25 years, close to,
 7        before you retired, you were eligible for and
 8        received, I'm assuming most years, that group
 9        incentive under the incentive compensation plan;
10        right?
11   A    Yeah, just to be clear.  So in 1997, I moved
12        down to Atlanta for a job not within corporate
13        accounts.  I was then promoted in 1998 to a
14        corporate accounts position, but it was not for
15        group purchasing organizations.
16   Q    Okay.  Mr. Thomson, we might be here for eight
17        hours if we get onto this.  I'm just trying to
18        say for over 20 years, you were in a position
19        eligible for a group incentive under the
20        incentive compensation plan; right?
21   A    Yes.
22   Q    Okay.  I'm really -- I'm just trying to do it.
23        If we're arguing about '97, '98, we will be here
24        forever.  I appreciate you being specific, but
25        we're being very specific on issues that really
```

Page 17

1        aren't that specific.

2            Let's talk about the other portion of the

3        incentive compensation plan.  For over 20 years,

4        the last 20 years of your employment, they

5        weren't always called KSO, but you were eligible

6        for what we're saying in this deposition for

7        some individual incentive under the incentive

8        compensation plan; right?

9    A   It's what I recall.  Again, I haven't gone back

10       and reviewed every incentive comp plan since

11       1997.

12   Q   Understood.  But you do recall that your

13       compensation as a sales employee did include

14       some type of both group incentive and individual

15       incentive; right?

16   A   That is correct.  Yes.

17   Q   And as to those incentives, you -- at Roche,

18       let's talk a little bit about Roche as to it.

19       Long-term employee, 43 years.  I'm assuming you

20       were very familiar with all of the various

21       complaint procedures that you had available to

22       you at Roche; right?

23   A   I'll say I wasn't because I never really had any

24       complaints.

25   Q   Okay.

```
 1    A    Until Jason Fowler.  Yeah.
 2    Q    Let's talk about it.  Certainly, if in 2010 you
 3         thought somebody was giving you discipline that
 4         wasn't appropriate, you knew how to figure out
 5         who to go and complain to; right?
 6    A    I would go to my manager, yes.  It was typically
 7         about miscalculations.
 8    Q    If your manager didn't satisfy -- I'm --
 9              Mr. Thomson, I'm trying to say if you
10         thought your manager -- let's say you thought
11         your manager in 2010 was discriminating against
12         you based on your age and was holding you to
13         different standards than your co-workers, you
14         could go to human resources; right?
15    A    Yeah.  I'm sure I could have, yes.
16    Q    You, as a long-term employee, could find the
17         various complaint procedures available to you at
18         Roche; right?
19    A    I'm sure I could if I dug deep enough, yes.
20    Q    Well, dug deep enough.  You had access to all
21         the policies and procedures and manuals on your
22         Roche computer; right?
23    A    Correct.
24    Q    Okay.
25    A    That talk about the calculations of KSOs or the
```

Page 25

```
 1   A   No.  I'm going to retire someday.  I didn't have
 2       a date set, no.
 3   Q   You're asking for payout.  I take it the payout
 4       meant you were leaving.  You were retiring, and
 5       you wanted a payout.
 6   A   Yes, I would -- I'm sorry to interrupt you.
 7           Yes.  I would leave because it was my
 8       belief that you didn't need four GPO people.
 9       You needed three.
10           It would be in the interest of the company
11       to move that into a more revenue-producing
12       position.
13   Q   Well, my question is -- well, let's take a step
14       back.  When did you announce your retirement?
15   A   August 31.
16   Q   And I can't imagine you made the decision on
17       August 30.  When did you make the decision that
18       you were going to be retiring at the end of
19       2022?
20   A   It's really the beginning of 2023.
21           However, I don't remember exactly.  All I
22       know is when I talked to Ron, I had no firm date
23       in mind.  So I was going to give as much notice
24       as possible.  That's why I gave, what, four
25       months' notice that I was retiring.  It was
```

Page 26

```
 1          sometime in the summer.  I said, Okay, I'm ready
 2          to go.
 3              A lot had to do with a big contract.  I was
 4          negotiating contracts with Vizient that were
 5          worth over $2 billion over the five-year term of
 6          these agreements.  So I wanted to complete those
 7          before I retired.  And two out of three I did
 8          complete.  The third one was postponed.  I
 9          wanted to leave Vizient in very good shape.
10    Q     When you went in to talk to Ron in March of
11          2022, you went in with a proposal that Roche
12          would pay you additional compensation to have
13          you retire and leave with your retirement
14          benefits; right?
15    A     A severance package, correct.
16    Q     You didn't go in and say, Hey, 2021, I should
17          have earned this.  You went in and said, I want
18          an additional sweetener to my retirement; right?
19    A     Let me think about that.  So, I mean, again, the
20          whole purpose of the call was to communicate
21          that for five years we didn't have specific and
22          measurable KSOs.  Remember that according to the
23          policy, that Jason -- the way it works is, the
24          objectives come down from senior management.
25          They filter all the way down.  Jason's job was
```

Page 28

```
 1        you proceeded to utilize all of your PTO; right?
 2        You didn't work much over your final six months
 3        of employment; right?
 4    A   That is not an accurate statement.
 5    Q   What is accurate?  How many PTO days did you
 6        take in 2022?
 7    A   Let me tell you what happened.  So on August --
 8    Q   No.  My question to you, John, is -- first of
 9        all -- here's what I would say.  I'm going to
10        ask you the questions.  You're going to answer.
11        If you want to then say, I've answered your
12        question, and I want to say more, you're free to
13        say whatever you would like.  Okay?  But right
14        now, I want to know how many PTO days, vacation
15        days did you take in 2022?
16    A   I don't have that information.  I can give you
17        an educated guess.
18    Q   Okay.  Why don't you give us that.
19    A   So I believe I had over 60 days accrued plus
20        what I would earn until January.  I initially
21        told Jason that I was going to do this.  He told
22        me HR would never agree to it.  He then told me
23        he was moving onto a different job.  So I didn't
24        want to leave Ron in a bad situation, so I
25        took -- if I had to guess, between 20 and 25 of
```

Page 29

1      those days between September and January 16.

2            Ten of those days were for a vacation to

3      Spain and Italy.

4    Q   So we took the vacation for the year.

5            Then let's just talk --

6            So your issue that you took to Ron was an

7      overall issue from 2018 to 2021, I guess, or

8      even 2022, and saying, I'll leave if you pay --

9      do you know what your demand was?  What did you

10     ask Ron for as the sweetener?

11   A   Standard severance package.

12   Q   So you just wanted a standard severance package,

13     meaning, Treat me as if you're eliminating my

14     position, is what you're saying?

15   A   That's exactly right.

16   Q   So that's why you told me that you were raising

17     with Ron, You don't need this many people in

18     corporate accounts.  Why don't you eliminate my

19     position and give me a severance?

20   A   You don't need this many people in corporate

21     accounts for GPOs.

22   Q   Got it.

23   A   Don't move that position out of corporate

24     accounts.  Just redirect it, reassign it.

25   Q   You're saying, Hey, why don't we do a win/win?

1    A    Yes.

2    Q    You never went to human resources about the

3         incentive compensation plan from 2000 to 2020?

4    A    Correct.

5    Q    And until the -- I mean, there was never

6         anything beyond that.  We talked about

7         everything as to your complaints internally to

8         Roche under the incentive compensation plan.

9         You have told me the number of years that you

10        can recall that you raised it with your direct

11        manager.  You raised it one time beyond that;

12        right?  We have talked about the one.

13   A    That is correct.

14            MR. CAMPBELL:  Why don't we take a short

15        break.  Why don't we come back at 20 after.

16        Does that work for everybody?  And we'll begin

17        with looking at some of your plans.  Okay?

18            THE WITNESS:  Okay.  Thank you.

19            (A recess was taken between 10:09 a.m. and

20        10:20 a.m.)

21   BY MR. CAMPBELL:

22   Q    So, Mr. Thomson, before we go to the next line

23        of questions, is there anything that you need to

24        supplement before I go on from your first period

25        of answering questions?

Page 33

```
1   A    No.

2   Q    So let me ask you some -- I'm going to show you

3        some exhibits now.  We're going to go through

4        some of the years on this.  I'm going to, first

5        of all, take you to what's been marked as

6        Exhibit 2.

7             (Deposition Exhibit 2 was presented for

8        identification.)

9   Q    I'm going to show you one of the attachments to

10       your complaint in this matter.

11            Can you see my screen, Mr. Thomson?

12  A    Yes, I can.

13  Q    I'm going to scroll through this just to verify

14       that you see the four pages.

15            What is this document?

16  A    This is the 2018 Incentive Compensation Plan for

17       Group Purchasing Organizations.

18  Q    Okay.  When did you typically receive this

19       document?

20  A    Typically in January.

21  Q    Okay.  January --

22  A    Yeah.

23  Q    I'm sorry.  January of 2018?

24  A    Correct.

25  Q    And you said you had to actually sign off on it?
```

Page 34

1   A   Yes.  Through the portal.  The learning portal

2       at Roche.

3   Q   You get it through the learning portal.  After

4       you receive this through the learning portal,

5       you would then have communications as a team

6       with your manager; right?

7   A   Well, I just want to be clear about this.  So

8       what we did with the portal was say that we read

9       it, acknowledged it.  You would get it from our

10      manager.

11  Q   Okay.  Then I believe you've already testified,

12      Mr. Thomson, I'm not trying to be difficult, but

13      I believe you testified that then your manager

14      would have communications with you and the rest

15      of the group purchasing organizations team about

16      it?

17  A   Correct.

18  Q   Okay.  And when did those communications

19      typically take place?  January, February?

20  A   It could be before.  Acknowledge that we read

21      it, or it could happen afterwards.

22  Q   When you got your midyear payout, did you meet

23      with your manager?

24  A   Well, when you say meet with them -- so we

25      would -- we typically would get the check,

```
 1          figure out how we got paid.  It wasn't always
 2          presented to us.
 3              Then I would reach out to understand why it
 4          was paid out in such a way.
 5     Q    Okay.  So you get -- you would receive your
 6          compensation midyear, and for 2018, was
 7          Mr. Fowler your manager?
 8     A    Yes.  The entire year.
 9     Q    So 2018, you received your midyear compensation.
10          And based on your practice at Roche, you would
11          then reach out to Mr. Fowler to say, Why did I
12          get paid X amount?
13     A    Have you scanned to look at the KSOs?  It has
14          changed over time when things were paid out.  I
15          just want to make sure I'm answering it
16          correctly.  Semiannual; right?  So semiannual on
17          KSOs.  So yes, we would have received a check
18          semiannual.
19     Q    Okay.  You would check with Mr. Fowler in 2018,
20          2019, 2020, 2021, and 2022, A, You paid out
21          blank amount.  Why?
22     A    Yes.
23     Q    Did you follow that same procedure at the annual
24          payout to check with Mr. Fowler in 2018, '19,
25          '20, '21, and '22, to review what you were paid
```

Page 36

1       out?

2   A   Yes.

3   Q   Okay.  So you received this.  I take it that if

4       you received this, certainly if you had

5       questions about, for example, KSO or anything

6       like that, you could go to Mr. Fowler or to

7       Mr. DiNizo or whoever his manager is to ask

8       questions about it; right?

9   A   Just to be specific, Ron DiNizo's manager is the

10      CEO of North America.  I probably wouldn't go to

11      him.

12  Q   I was saying Mr. Fowler's manager you could go

13      to; right?

14  A   That is correct.

15  Q   Or you could go to HR if you wanted to say, Hey,

16      I've got questions about my incentive

17      compensation plan; right?

18  A   Correct.

19  Q   I assume you and your co-workers in the group

20      sales organization would be speaking during that

21      time frame as well to say, Hey, what do you

22      think about it, and those types of things;

23      right?

24  A   Yes.

25  Q   And I take it that the plans, they certainly

Page 37

```
 1        changed somewhat each year, but in general,
 2        these plans weren't -- I guess they didn't
 3        reinvent the wheel every year; right?  They were
 4        pretty consistent throughout the course of your
 5        20 years under the incentive compensation plan?
 6   A    I would not say "consistent."  If you look at
 7        the 2018, 80 percent of the payout was based on
 8        KSOs.
 9   Q    Okay.
10   A    If you look at future years, I think as low as
11        maybe 30 percent were based on KSOs.  To me,
12        that's pretty substantial.
13   Q    From 2018 to 2022, you're saying the percentage
14        of the KSO payout went down?
15   A    Well, it changed.  I don't have it all committed
16        to memory, but they change, which I'm sure we
17        will see.  If you would, it's 80 percent for
18        2018.
19   Q    And I guess I would say that is a change, but my
20        question to you would be although the
21        percentages might be changed and the revenue
22        projections might be changed as to the group
23        points and those types of things, obviously,
24        they are increasing or decreasing based on the
25        market and based on Roche's sales.  But in
```

```
 1        general, the criteria for you to earn your
 2        compensation weren't drastically changing over
 3        the course of those 20 years that you were on
 4        the incentive compensation plan; right?
 5    A   Again, it depends how you define "drastically,"
 6        but in general, I agree with you.
 7    Q   Okay.  So let me take you now to the 2018 -- I'm
 8        going to take you now to Deposition Exhibit 1.
 9            (Deposition Exhibit 1 was presented for
10        identification.)
11    Q   Can you see my screen?
12    A   Yes.
13    Q   Do you recognize this document, this
14        31-page document?
15    A   Yes.
16    Q   I'm happy -- do you want me to scroll through
17        all the pages?
18    A   Depends on what you're going to ask.  I don't
19        have it committed to memory.  No.
20    Q   Are you familiar with RDC-107?
21    A   Yes.
22    Q   And this is the description for this year, this
23        is what we're looking at, just so we're clear,
24        it was effective February 7, 2018; right?
25    A   Yes.
```

Page 39

1    Q    And this is the Sales and Service Incentive
2         Compensation Plan Policy for that time period;
3         right?
4    A    Yes.
5    Q    So this is what that Exhibit 2 is based off of
6         that I just showed you; right?
7    A    Yes.
8    Q    Okay.  If you wanted to take a look at the
9         actual plan policy, were you looking at RDC-107
10        every year or just some years?
11   A    I would say every year because it's changed
12        periodically.  Probably changed four or five
13        times, yeah.
14   Q    How did it -- I guess I would say how did you
15        have access to it as a Roche employee?  Where
16        did you get access to RDC-107?
17   A    Typically, it would be part of the learning, the
18        learning portal.  You would get an email saying,
19        You need to go out and read and understand this,
20        is how we would get access to it.
21   Q    This is every year that you were under the
22        incentive compensation plan, you would -- on the
23        learning portal, you would get notice of, Here's
24        your plan for the group sales, as well as here's
25        RDC-107 that you should review and acknowledge

Page 40

1      receipt of?

2   A   No.  Only when they changed.

3   Q   Only when they changed.  Okay.

4          So if we see each year from 2018 to 2022

5      that RDC-107 changed, you would have gotten it

6      on the learning portal each year?

7   A   Yes.

8   Q   So let's look at this one.  I just want to take

9      you to Section 4 on this document.

10         Section 4, do you see that on my screen?

11  A   Yes.

12  Q   And Section 4, Incentive Plan Payment Review.

13     Did I read that right?

14  A   Yes.

15  Q   This one states, and I'll read it just for the

16     record.  Then I'll ask you some questions.

17         Let me read it first, and I'll ask you some

18     questions.

19         "Employees on ICP" --

20         That's this incentive compensation plan;

21     right?

22  A   Yes.

23  Q   -- "are responsible for reviewing and confirming

24     the accuracy of their commission and bonus

25     payments."

Page 42

1    A    That's not -- go ahead.

2              MS. CONKLIN:  Objection.  Misstates the

3         record.

4              Go ahead, John.

5    A    Yes, I did.

6    BY MR. CAMPBELL:

7    Q    Well, I guess, first of all, I asked you about

8         your complaints, okay, and what you did.  You

9         only met with Jason Fowler's manager on one

10        occasion.  That was 2022; right?

11   A    Correct.

12   Q    Are you saying you submitted this incentive plan

13        payment review, this written discrepancy every

14        year from 2018 to 2022?

15   A    Only 2018 because of, as this says, there was a

16        mistake in the calculation of the payout.

17   Q    I'm not -- let me be clear with you.  Okay?  I'm

18        not looking -- if you want to at the end of your

19        statement explain further and give your argument

20        for it, you're welcome to do that.  Okay?  I

21        don't have any problem with you doing that.  But

22        I'd like you to answer my questions, okay,

23        first.  Because if you don't answer my

24        questions, I just have to ask it two or three or

25        four times to get it, and then we go back and

Page 43

1        forth.  Okay?  Let me ask you first.
2              So from what you just said, 2019, 2020,
3        2021, and 2022, you did not submit this written
4        review; right?
5              I don't think you came through.  I didn't
6        hear you.
7    A   Correct.  Can you hear me?
8    Q   Now, I can hear you.  Okay.  In 2018, you did,
9        and that was due to what?  You said there was a
10       calculation error?
11   A   Yes.
12   Q   Was that corrected?
13   A   Yes.
14   Q   So you didn't in 2018 say, Hey, I don't think I
15       was paid out enough on the KSO, in writing?
16   A   In writing, no.
17   Q   You didn't do that for 2019, 2020, 2021, or
18       2022; correct?
19   A   Well, I would -- I don't believe that's an
20       accurate statement either, as we discussed.
21             Well, I'll leave it there.
22   Q   I didn't ask you whether it was accurate or not.
23       I asked you for an answer.  I think you've
24       already answered it, but please confirm.  You
25       didn't submit this written objection under the

```
 1       more than the others.
 2   Q   So you think that you achieved more than your
 3       three co-workers in 2018?
 4   A   Yes.
 5   Q   Now, you had the opportunity when you got paid
 6       your ICO payments, semiannual and annual, you
 7       sat down with Mr. Fowler to discuss it on both
 8       of those occasions; right?
 9   A   Yes.
10   Q   You had the opportunity to say to him, This is
11       how well I did.  I think I performed better than
12       my co-workers.  Right?
13   A   I would say I didn't really position as better
14       than my co-workers.  This is what I
15       accomplished.  Because what my fellow co-workers
16       make is really none of my concern; right?  My
17       concern is how did I do against KSOs that
18       weren't developed.
19   Q   I guess, well, first of all, if the KSOs,
20       Mr. Thomson, weren't developed, and you didn't
21       know what to do, is it your testimony -- let's
22       be clear.  You're a 43-year employee, been a
23       sales employee for every 20 years.  Is it your
24       testimony that you had no idea what it took in
25       order to be a good employee at Roche and to earn
```

Page 62

1        your KSO?  Is that your testimony?

2    A   My testimony is I knew what I had to do to be

3        successful.  There's nothing to measure me

4        against.

5    Q   But my question is, you certainly knew, after 20

6        years as a salesperson, and if you claimed to

7        have known enough how to reconfigure this

8        department to be more profitable, you certainly

9        understood what it took for you to be excelling

10       in your position; right?

11   A   Yes.

12   Q   It wasn't a mystery to you.  You weren't a new

13       employee to sales and needed to be sat down and

14       told, This is what you should be doing every

15       day.  You knew it; right?  Whether Mr. Fowler

16       was your manager, or if Mr. Fowler had been

17       replaced the next day, you knew what your job

18       was, and you knew what it took to be a good

19       Roche employee in your department; right?

20   A   Because we had no KSOs, it was difficult to read

21       Jason's mind to know what he felt was important.

22   Q   Certainly, you had every opportunity to go to

23       human resources or to Mr. Fowler's manager or to

24       anyone else at Roche to say, Look, I believe

25       that after 20 years, I don't know enough to be

Page 63

1   able to determine what it takes to be a good

2   Roche employee.  I need to have more directive

3   for that, and I'm complaining about it.  Right?

4   You knew how to do that?

5  A   No.  I'm not characterizing my words -- maybe I

6   could try to explain it again.

7       I know what it takes to be a good employee.

8   I do.  I've been very successful for 43 1/2

9   years.

10      The key sales objectives change over the

11  years.  They are supposed to come from top down.

12  That never happened.

13 Q  Okay.

14 A  What Jason thought was what I should be doing

15  may not align 100 percent with what I thought

16  was important.  I knew how to be a good

17  employee.

18 Q  Okay.  I guess I would say this.  We're sitting

19  here, five years after 2018, with you claiming

20  without any proof; right?  You haven't reviewed

21  Ms. Boik's sales efforts, performance reviews,

22  or anything for 2018; right?

23 A  Correct.

24 Q  You don't have any basis, aside from your own

25  subjective opinion, that you were performing

Page 65

```
 1        January 30, 2019; right?
 2   A    That's not accurate, no.
 3   Q    When did you get your payout?
 4   A    It was typically in February.  February 15.
 5   Q    That's even more to my point.  February 15, you
 6        get your payout, you go talk to Mr. Fowler.  By
 7        that time, you had already received the
 8        incentive comp plan and the RDC-107 for the next
 9        year; right?
10   A    Yes.
11   Q    So if we're sitting in February 2019, and you
12        sit down with Mr. Fowler, and he tells you --
13        you were close to a hundred percent in every
14        year aside from 2019; right?
15   A    Yes.
16   Q    He told what you percentage you were paid out;
17        right?
18   A    After I questioned him about, yes.  I can
19        calculate it myself based on my check.
20   Q    So whether you had a question and calculate
21        it -- you knew whether you were at 100 percent,
22        102 percent, or some other number; right?
23   A    Yes.
24   Q    And so if you were paid out 100 percent and felt
25        you should have been paid more, you had every
```

Page 70

1    performance review to human resources, you could

2    have taken it to Mr. Fowler's manager.  If you

3    felt it was wrong, you had a variety of ways to

4    challenge it; right?

5  A   I did.

6  Q   And you didn't?

7  A   For what I considered very good reasons.

8  Q   What's a good reason that you're filing a

9    lawsuit four or five years after the fact?  You

10    don't raise anything then, but now you're saying

11    it was a wrong evaluation.  That's what you're

12    saying; right?

13  A   I am.

14  Q   Don't you think that in order to really

15    determine whether that's a proper evaluation or

16    not, that you have to timely say, Hey, I don't

17    agree with this, and HR, can you review it?

18  A   So HR was supposed to sign off on the KSOs;

19    right?  They didn't do it.  Ron DiNizo was

20    supposed to sign off on the KSOs, didn't do it.

21    Jason Fowler never developed them.  It was my

22    opinion I couldn't win because they are all in

23    on it.

24  Q   My question to you was, on the performance

25    evaluation that you said you disagreed with that

1      Mr. Fowler gave you for 2019, you should have

2      then went to human resources to say, I disagree

3      with this.  My performance was much better than

4      what Mr. Fowler believes.  Right?

5   A  Could have.  Yes.

6   Q  Well, I mean, you think that that would be a

7      more appropriate forum than to, five years

8      later, raise a lawsuit and subjectively claim

9      that somehow Mr. Fowler was wrong?

10  A  Disagree with that statement.

11  Q  Okay.  So the payouts on this year, again, it

12     looks like your co-workers were paid out close

13     to a hundred percent, and I believe you were

14     paid out a little under 90 percent; right?

15  A  I believe that to be correct.  Yes.

16  Q  You knew your payout percentage when this was

17     presented to you in February of 2020; correct?

18  A  I knew it when I received my check.

19     February 15.

20  Q  Then you went and met with Mr. Fowler to discuss

21     why you received that percentage payout?

22  A  We had that discussion before that time.  But

23     yes.

24  Q  And if you disagreed with that, you felt that

25     your payout should have been the maximum, you

certainly could have went to human resources or Jason Fowler's supervisor to raise that complaint; right?
And you did not?
A Correct.
Q Let me take you to Exhibit 13.
(Deposition Exhibit 13 was presented for identification.)
Q Let's look at Exhibit 13. Then Exhibit 13 is the payout for our 2020 ICP; correct?
A There it is. Yes.
Q Let's look at --
Was this your team in 2020?
A Yes, it was.
Q Okay. Let's look at the KSO payouts. If we look here, the KSO payouts were you were paid identical aside from one of your co-workers, and it looks like that co-worker was Catherine Boik; correct?
A Correct.
Q And you believe that you outperformed your three other co-workers in 2020?
A I really don't have knowledge enough to answer that question.
Q And Mr. Fowler told you at the end, the

Page 74

```
 1        in 2020; right?
 2   A    Completely subjective, yes.
 3   Q    And if you disagreed with his subjective
 4        perception of your performance, you could have
 5        went to the human resources department; correct?
 6   A    Could have, yes.
 7   Q    Could have went to Ron and said, Ron, I think I
 8        was outperforming or I could have outperformed
 9        had I gotten written KSO prior to just having
10        verbal discussions with Mr. Fowler; right?
11   A    Absolutely.
12   Q    Okay.  And you didn't do that in 2021; right?
13   A    Yes.
14   Q    Okay.  Now let's go to -- let me stop my share.
15        Let's go to our next exhibit, Exhibit 14.
16            (Deposition Exhibit 14 was presented for
17        identification.)
18   Q    I'm going to take you to Exhibit 14.  First of
19        all, for the 2020 payout, was that your team?
20   A    This looks like 2021.
21   Q    That's right.  The 2021 ICP?
22   A    Correct.
23   Q    2021 ICP, it looks like for KSO, you were paid
24        out $30,000 in 2021?
25   A    Correct.
```

Page 75

1    Q    And what percentage was that?

2    A    I believe it was 100 percent.

3    Q    Did you -- aside from 2019, did you receive a

4         hundred percent each of the other years?

5    A    I think 2018 was just a hair under and 2022 was

6         just a hair over.  I believe the other ones were

7         100 percent.

8    Q    So a hundred percent, and as to it -- okay.  On

9         this year, it looks like Whitney Johnson and

10        Sonal Patel both earned less than you on the

11        KSO; correct?

12   A    There's a reason for that, but yes.  Whitney

13        Johnson left her position during the year, and

14        Sonal took over her position.  So they were paid

15        based on time in position.

16   Q    Their total for that position is less than

17        yours; right?

18   A    The position -- the territory was open for quite

19        a bit of the year.  Yes.

20   Q    Then we get into Richard and Catherine, and they

21        both earned more than you in 2021; right?

22   A    Yes.

23   Q    How was your performance in comparison to

24        Richard and Catherine in 2021?

25   A    I really don't have enough knowledge to comment.

Page 76

```
 1    Q    And this is the year that you met with
 2         Mr. Fowler.  You talked to Mr. Fowler in
 3         February 2022.  He gave you his reasoning, and
 4         you said in, what, March is when you went to
 5         Ron?
 6    A    Yes.  I believe it was March, yes.  That we had
 7         our Zoom call.
 8    Q    Then March is when you said, I'd like you to --
 9         I think that this department would be better
10         suited if you give me a severance and move my
11         role to a different -- different area, I guess,
12         is what you were saying?
13    A    Yes.
14    Q    Okay.  So now I have to say to you that if they
15         had just had somebody leave -- Whitney had just
16         left the department, and they replaced Whitney
17         with Sonal; right?  During 2021?
18    A    Yes.
19    Q    It would seem that your reasoning was contrary
20         to Ron and Jason's view of the department;
21         right?
22    A    I don't agree with that statement.
23    Q    You don't agree.  Don't you think that if they
24         believed you were right or your reasoning was
25         right, that when Whitney Johnson left, they
```

1    in these positions, and have them do more than

2    what we had been -- more than what our

3    accountabilities back then included.

4  Q  Okay.  Let's go to our final exhibit.

5    Exhibit 15.

6        (Deposition Exhibit 15 was presented for

7    identification.)

8  Q  So for the 2022 ICP, were these your co-workers?

9  A  Yes.

10  Q  And the earnings -- let me see, it's a little

11    different here.  What was your payout under the

12    KSO in 2022, the ICP 2022?

13  A  I believe it was 103 percent.

14  Q  103 percent.  Okay.  Do you know where your

15    co-workers fell?

16  A  I know Rick Feid was at 114 percent.

17  Q  Do you know where Sonal and Catherine were?

18  A  No.  But if you -- based on Catherine's payout,

19    she was greater than 115 percent.  Because I

20    believe she --

21  Q  I'm sorry.

22        What column are you looking at?

23  A  Could you keep going?  Is there more?

24  Q  Year-to-date payout?

25  A  No.  This may not have been year end.  Is there

1       over if they excelled or under a hundred percent

2       if they had a poor year?  Did you hear that

3       testimony?

4   A   I would agree with that, that I did hear it.

5   Q   You heard it.

6           Certainly -- let me ask you this.  When you

7       were talking to Jason, did he explain to you

8       that mindset of you were earning around a

9       hundred percent and you're doing your job.  If

10      you want to earn higher, this is what you have

11      to do in order to earn higher?

12  A   Disagree with that.  That's why he didn't

13      develop KSOs.  If they had developed KSOs, I

14      would agree with that statement.  Never had

15      those discussions.

16  Q   I guess I would say, sir, the time to say, I

17      don't have a KSO when I want to have it, would

18      presumably be January, February, March, April,

19      May of the year of the compensation plan; right?

20  A   Absolutely.

21  Q   And that's the time when you go to human

22      resources or you go to Ron, and you say, Hey, I

23      would like Jason to give me more specific KSO

24      because even though I've been here, I don't know

25      what Jason might be looking at to be positive,

Page 84

1    A    No.  I disagree with that.

2    Q    What are you saying?  I don't understand.

3    A    He had no reason to be upset with me in 2018 for

4         a calculation error that was easily resolved.

5    Q    Okay.  I thought you alluded to the 2019 was

6         somehow retaliation?  Did I hear you wrong?

7    A    No.  No.  Future.  Beyond 2019.  He could

8         take -- he could hurt me financially as he did

9         in 2019, is my point.

10   Q    Okay.  So you're not saying he retaliated

11        against you in 2019 for the calculation error

12        that was corrected in 2018?

13   A    That is correct.  Yes.

14   Q    You're saying that you understood you could have

15        complained, and you could have asked Ron for

16        more specific KSOs, but you were afraid that

17        Mr. Fowler would somehow retaliate against you?

18   A    Yeah, that was a concern.  Absolutely.

19   Q    Okay.  You understand that the reason why we

20        have complaint procedures and we say, There's no

21        retaliation; right?  You understand that at

22        Roche?

23   A    Sure.

24   Q    They tell you, We give you all these complaint

25        procedures.  They don't give you all the

# EXHIBIT 1

## CONFIDENTIAL, FILED UNDER SEAL

## **EXHIBIT 3**

## **CONFIDENTIAL, FILED UNDER SEAL**

# **<u>EXHIBIT 5</u>**

## **CONFIDENTIAL, FILED UNDER SEAL**

# **EXHIBIT 7**

## **CONFIDENTIAL, FILED UNDER SEAL**

## **EXHIBIT 9**

## **CONFIDENTIAL, FILED UNDER SEAL**

| Run Date | Sortby_Dim | Payee ID | Name | Zone Territory | Active Territory | Paid Territory | Business Unit ID | Sales Team | Role ID | Payout Period | ACCEL - GROWTH | BAL PLAN ACCEL - ANNUAL | KSO | MBO | NEW HIRE P | OPEN TERRITORY | REV ACCEL - QUARTERLY Q | REVENUE - ANNUAL - PROFIT | REVENUE - TOTAL | SPIFF | Current Ne GRAND TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1/30/2019 14:14 | BOIK, CATHERINE | 10039263 | BOIK, CATHERINE | Null | GPO30 | GPO30 | CA | CA | CA-NO-GPO | 2018-12 DEC | | | $42,286.40 | | | | | | $10,400.00 | | $ 52,686.40 |
| 1/30/2019 14:14 | FEID, RICHARD | 7415 | FEID, RICHARD | Null | GPO20 | GPO20 | CA | CA | CA-NO-GPO | 2018-12 DEC | | | $42,556.80 | | | | | | $10,400.00 | | $ 52,956.80 |
| 1/30/2019 14:14 | JOHNSON, WHITNEY | 30088 | JOHNSON, WHITNEY | Null | GPO10 | GPO10 | CA | CA | CA-NO-GPO | 2018-12 DEC | | | $42,556.80 | | | | | | $10,400.00 | | $ 52,956.80 |
| 1/30/2019 14:14 | THOMSON, JOHN | 1282 | THOMSON, JOHN | Null | GPO40 | GPO40 | CA | CA | CA-NO-GPO | 2018-12 DEC | | | $40,726.40 | | | | | | $10,400.00 | | $ 51,126.40 |

| Run Date | SortBy_Dim | Payee ID | Name | Zone Territory | Active Territory | Paid Territory | Business Unit ID | Sales Team | Role ID | Payout Period | ACCEL - GRO BAL PLAN ACCEL - ANNUAL KSO | | H1 KSO Scor | H2 KSO So | YTD KSO |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1/30/2019 14:14 | JOHNSON, WHITNEY | 30088 | JOHNSON, WHITNEY | Null | GPO10 | GPO10 | CA | CA | CA-ND-GPO | 2018-12 DEC | | $42,556.80 | 100% | 105% | $ 42,556.80 |
| 1/30/2019 14:14 | FEID, RICHARD | 7415 | FEID, RICHARD | Null | GPO20 | GPO20 | CA | CA | CA-ND-GPO | 2018-12 DEC | | $42,556.80 | 100% | 105% | $ 42,556.80 |
| 1/30/2019 14:14 | BOIK, CATHERINE | 10039263 | BOIK, CATHERINE | Null | GPO30 | GPO30 | CA | CA | CA-ND-GPO | 2018-12 DEC | | $42,286.40 | 100% | 103% | $ 42,286.40 |
| 1/30/2019 14:14 | THOMSON, JOHN | 1282 | THOMSON, JOHN | Null | GPO40 | GPO40 | CA | CA | CA-ND-GPO | 2018-12 DEC | | $40,726.40 | 100% | 96% | $ 40,726.40 |

| Run Date | SortBy_Dim | Payee ID | Name | Zone Territory | Active Territory | Paid Territory | Business Unit ID | Sales Team | Role ID | Payout Period | ACCEL - GROWT | BAL PLAN ACCEL | KSO | MBO | OPEN TERRITORY | PRIOR YEAR ADJUSTMENTS | REVENUE - ANNU/ | REVENUE - TOTAL | NEGATIVE | GRAND TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1/31/2020 16:26 | Bolk, Catherine | 10039263 | Bolk, Catherine | Null | GPO30 | GPO30 | CA | CA | CA-ND-GPO | 2019-12 DEC | | | $44,720.00 | | | | | $8,450.00 | | $53,170.00 |
| 1/31/2020 16:26 | Feid, Richard | 7415 | Feid, Richard | Null | GPO20 | GPO20 | CA | CA | CA-ND-GPO | 2019-12 DEC | | | $41,600.00 | | | ($1,830.00) | | $8,450.00 | | $48,220.00 |
| 1/31/2020 16:26 | Johnson, Whitney | 30088 | Johnson, Whitney | Null | GPO10 | GPO10 | CA | CA | CA-ND-GPO | 2019-12 DEC | | | $42,224.00 | | | | | $8,450.00 | | $50,674.00 |
| 1/31/2020 16:26 | Thomson, John | 1282 | Thomson, John | Null | GPO40 | GPO40 | CA | CA | CA-ND-GPO | 2019-12 DEC | | | $37,648.00 | | | $1,040.00 | | $8,450.00 | | $47,138.00 |

| Run Date | SortBy_Dir | Payee ID | Name | Zone Territ | Active Terr | Paid Territ | Business U | Sales Team | Role ID | Payout Period | Score |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ######## | Boik, Cathe | 10039263 | Boik, Cathe | Null | GPO30 | GPO30 | CA | CA | CA-ND-GPO | 2019-06 JUN | 100% |
| ######## | Feid, Richa | 7415 | Feid, Richa | Null | GPO20 | GPO20 | CA | CA | CA-ND-GPO | 2019-06 JUN | 100% |
| ######## | Johnson, V | 30088 | Johnson, V | Null | GPO10 | GPO10 | CA | CA | CA-ND-GPO | 2019-06 JUN | 100% |
| ######## | Thomson, . | 1282 | Thomson, . | Null | GPO40 | GPO40 | CA | CA | CA-ND-GPO | 2019-06 JUN | 100% |

| Position | NCAD/NSSD | CAD/CAM | KSO or MBO | Score |
|----------|-----------|---------|------------|-------|
| CA-ND-GPO | Jason Fowler | Boik, Catherine | KSO CA-ND-GPO | 115.0% |
| CA-ND-GPO | Jason Fowler | Johnson, Whitney | KSO CA-ND-GPO | 102.5% |
| CA-ND-GPO | Jason Fowler | Feid, Richard | KSO CA-ND-GPO | 100.0% |
| CA-ND-GPO | Jason Fowler | Thomson, John | KSO CA-ND-GPO | 81.0% |

| Comp Plan | Territory | Payee | Payee Name | Period | Report Pulled Date | ACCEL - BAL PLAN | ACCEL - GROWTH | KSO | NEGATIVE BALANCE | NEW HIRE PLAN | OPEN TERRITORY | PRIOR BALANCE | PROFIT | REVENUE - COVID-19 - NATL - ANNUAL | REVENUE - TOTAL | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CA-CAD-GPO | A10G01 | 0 | No Employee | 202112 | 1/21/2022 16:10 | $ - | | $ - | | | | | | $ 2,421.92 | $ 5,604.39 | $ 8,026.31 |
| CA-CAD-GPO | A10G01 | 30088 | Johnson, Whitney | 202112 | 1/21/2022 16:10 | $ - | | $ 7,541.44 | | | | | | $ 1,620.55 | $ 7,479.45 | $ 16,641.44 |
| CA-CAD-GPO | A10G01 | 10110496 | Patel, Sonal | 202112 | 1/21/2022 16:10 | $ - | | $ 11,250.00 | | | | | | $ 2,457.53 | $ 11,342.46 | $ 25,049.99 |
| CA-CAD-GPO | A10G02 | 7415 | Feld, Richard | 202112 | 1/21/2022 16:10 | $ 35,000.00 | | $ 35,400.00 | | | | | | $ 6,500.00 | $ 30,000.00 | $ 106,900.00 |
| CA-CAD-GPO | A10G03 | 10039263 | Boik, Catherine | 202112 | 1/21/2022 16:10 | $ 35,000.00 | | $ 40,500.00 | | | | | | $ 6,500.00 | $ 30,000.00 | $ 112,000.00 |
| CA-CAD-GPO | A10G04 | 1282 | Thomson, John | 202112 | 1/21/2022 16:10 | $ - | | $ 30,000.00 | | | | | | $ 6,500.00 | $ 30,000.00 | $ 66,500.00 |

| Comp Plan | Component | Territory | Payee | Payee Name | Year-Qtr | Period | Report Pulled Date | H1 Rating | H1 KSO Payout | H2 Ratin | H2 KSO Payout | YTD KSO Payout |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CA-CAD-GPO | KSO | A10G01 | 30088 | Johnson, Whitney | 2021-Q2 | 202106 | 1/14/2022 15:35 | 100% | $ 7,541.44 | | | $ 7,541.44 |
| CA-CAD-GPO | KSO | A10G01 | 1E+07 | Patel, Sonal | 2021-Q4 | 202112 | 1/14/2022 15:35 | 0% | $ - | 100.0% | $11,250.00 | $11,250.00 |
| CA-CAD-GPO | KSO | A10G02 | 7415 | Feid, Richard | 2021-Q4 | 202112 | 1/14/2022 15:35 | 120.0% | $ 18,000.00 | 116.0% | $17,400.00 | $35,400.00 |
| CA-CAD-GPO | KSO | A10G03 | 1E+07 | Boik, Catherine | 2021-Q4 | 202112 | 1/14/2022 15:35 | 150.0% | $ 22,500.00 | 120.0% | $18,000.00 | $40,500.00 |
| CA-CAD-GPO | KSO | A10G04 | 1282 | Thomson, John | 2021-Q4 | 202112 | 1/14/2022 15:35 | 100.0% | $ 15,000.00 | 100.0% | $15,000.00 | $30,000.00 |

| Comp Plan | Component | Territory | Payee | Payee Name | Period | Report Pulled Date | Sum of Variance To Prior Qtr | Quota FY | Actual | Quota | Max. Attainment | TIP | Capped Rate | Capped Earnings | Uncapped Rate | Uncapped Earnings | Ytd Payout | Current Payout |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CA-CAD-GPO | REVENUE - COVID-19 - NATL - ANNUAL | A10G01 | 30088 | Johnson, Whitney | 2E+05 | 1/20/2022 11:06 | 0 | 1 | 1.02 | 1 | 1.02 | 0.249 | 1.3 | $6,500.00 | 1.3 | $6,500.00 | $1,620.55 | $1,620.55 |
| CA-CAD-GPO | REVENUE - COVID-19 - NATL - ANNUAL | A10G01 | 0 | No Employee | 2E+05 | 1/20/2022 11:06 | 1.02 | 1 | 1.02 | 1 | 1.02 | 0.373 | 1.3 | $6,500.00 | 1.3 | $6,500.00 | $2,421.92 | $2,421.92 |
| CA-CAD-GPO | REVENUE - COVID-19 - NATL - ANNUAL | A10G01 | 1E+07 | Patel, Sonal | 2E+05 | 1/20/2022 11:06 | 0 | 1 | 1.02 | 1 | 1.02 | 0.378 | 1.3 | $6,500.00 | 1.3 | $6,500.00 | $2,457.53 | $2,457.53 |
| CA-CAD-GPO | REVENUE - TOTAL | A10G01 | 30088 | Johnson, Whitney | 2E+05 | 1/20/2022 11:06 | 255,281,397.75 | ########### | 475,569,250.92 | 433,445,983.96 | 1.1 | 0.249 | 2 | $30,000.00 | 2 | $30,000.00 | $7,479.45 | $3,708.73 |
| CA-CAD-GPO | REVENUE - TOTAL | A10G01 | 1E+07 | Patel, Sonal | 2E+05 | 1/20/2022 11:06 | 127,793,757.43 | ########### | 475,569,250.92 | 433,445,983.96 | 1.1 | 0.378 | 2 | $30,000.00 | 2 | $30,000.00 | $11,342.46 | $9,446.86 |
| CA-CAD-GPO | REVENUE - COVID-19 - NATL - ANNUAL | A10G02 | 7415 | Feid, Richard | 2E+05 | 1/20/2022 11:06 | 1.02 | 1 | 1.02 | 1 | 1.02 | 1 | 1.3 | $6,500.00 | 1.3 | $6,500.00 | $6,500.00 | $6,500.00 |
| CA-CAD-GPO | REVENUE - TOTAL | A10G02 | 7415 | Feid, Richard | 2E+05 | 1/20/2022 11:06 | 127,793,757.43 | ########### | 475,569,250.92 | 433,445,983.96 | 1.1 | 1 | 2 | $30,000.00 | 2 | $30,000.00 | $30,000.00 | $18,750.00 |
| CA-CAD-GPO | REVENUE - COVID-19 - NATL - ANNUAL | A10G03 | 1E+07 | Boik, Catherine | 2E+05 | 1/20/2022 11:06 | 1.02 | 1 | 1.02 | 1 | 1.02 | 1 | 1.3 | $6,500.00 | 1.3 | $6,500.00 | $6,500.00 | $6,500.00 |
| CA-CAD-GPO | REVENUE - TOTAL | A10G03 | 1E+07 | Boik, Catherine | 2E+05 | 1/20/2022 11:06 | 127,793,757.43 | ########### | 475,569,250.92 | 433,445,983.96 | 1.1 | 1 | 2 | $30,000.00 | 2 | $30,000.00 | $30,000.00 | $18,750.00 |
| CA-CAD-GPO | REVENUE - COVID-19 - NATL - ANNUAL | A10G04 | 1282 | Thomson, John | 2E+05 | 1/20/2022 11:06 | 1.02 | 1 | 1.02 | 1 | 1.02 | 1 | 1.3 | $6,500.00 | 1.3 | $6,500.00 | $6,500.00 | $6,500.00 |
| CA-CAD-GPO | REVENUE - TOTAL | A10G04 | 1282 | Thomson, John | 2E+05 | 1/20/2022 11:06 | 127,793,757.43 | ########### | 475,569,250.92 | 433,445,983.96 | 1.1 | 1 | 2 | $30,000.00 | 2 | $30,000.00 | $30,000.00 | $18,750.00 |

TIP=Time in Position
Covid Revenue was raised to 102% for all employees as forecasting such a large number was difficult to predict

| Comp Plan | Territory | Payee | Payee Name | Period | Report Pulled Date | ACCEL - BAL PLAN | ACCEL - GROWTH | NEW HIRE PLAN | Total |
|---|---|---|---|---|---|---|---|---|---|
| CA-CAD-GPO | A10G02 | 7415 | Feid, Richard | 202112 | 1/21/2022 15:35 | $ 35,000.00 | | | $ 35,000.00 |
| CA-CAD-GPO | A10G03 | 10039263 | Boik, Catherine | 202112 | 1/21/2022 15:35 | $ 35,000.00 | | | $ 35,000.00 |

```
               IN THE UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF INDIANA
                     INDIANAPOLIS DIVISION
                 CAUSE NO. 1:23-CV-00099-SEB-MG


JOHN THOMSON,                      )
                                   )
                   Plaintiff,      )
                                   )
            -vs-                    )
                                   )
ROCHE DIAGNOSTICS CORPORATION,     )
                                   )
                   Defendant.      )
```

The videoconference deposition upon oral examination of JASON FOWLER, a witness produced and sworn before me, Dana S. Miller, RPR, CRR, a Notary Public in and for the County of Boone, State of Indiana, taken on behalf of the Plaintiff, appearing remotely from Fishers, Hamilton County, Indiana, on the 28th day of August, 2023, at 9:32 a.m., pursuant to the Federal Rules of Civil Procedure.

```
                     CIRCLE CITY REPORTING
                     135 North Pennsylvania
                           Suite 1720
                     Indianapolis, IN  46204
                        (317) 635-7857
```

1      of which was a corporate account manager covering

2      Contract Research organizations.

3   Q  And how many members were there of the GPO Sales

4      team at the time you managed that team?

5   A  There were four.

6   Q  Okay.  And John Thomson was one of those four?

7   A  Yes.

8   Q  And so, were you John Thomson's direct supervisor

9      from 2015 all the way through 2022?

10  A  Yes.

11  Q  And, in general, how would you describe your

12     professional relationship with John Thomson?

13  A  I thought it was pretty good.  I think initially it

14     was a rocky start, but we eventually developed a

15     good working relationship.

16  Q  Why do you think it was a rocky start?

17  A  Prior to me joining the team, John reported

18     directly to the head of Corporate Accounts.  And as

19     part of the reorganization that I joined the team

20     as part of, all of the GPO CADs were moved under

21     me, and I reported to the head of Corporate

22     Accounts.

23         So initially John was unhappy that he no

24     longer -- that he reported to me instead of the

25     head of Corporate Accounts.

```
1   Q   And let me know if you're having any trouble seeing
2       that, and I'm happy to scroll through the document,
3       too.
4           And my question to you is going to be whether
5       you recognize this as the Incentive Compensation
6       Plan that would have applied to your group for
7       fiscal year 2018?
8   A   Yeah, it looks like it.  Looks like the format that
9       typically we use.
10  Q   Okay.  And then I'm, for your reference, going to
11      page 3 of Exhibit 1 where it says "Section 3.
12      Incentive Determination & Payout Tables" at the
13      top.  And there's a section called "KSO (Key Sales
14      Objectives)."
15          Can you just give me a quick explanation of
16      what a KSO is?
17  A   Typically KSO is a non-quantitative measure of
18      performance for the sales team.  So it's
19      specifically used for the sales team, and it's
20      separate from the sales or profit or placement
21      targets that are quantifiable metrics.
22  Q   And so, are the KSOs unique to each individual on
23      the team or are they more general?
24  A   Typically they are general to the specific role.
25      So on my team, KSO team, GPO CAD, the KSOs would be
```

1  A  So they would have a -- I'm trying to think.  Do
2      you mean -- maybe just a clarifying question.
3        Do you mean what form do they take or what are
4      the actual KSOs themselves?
5  Q  Yeah, I'm more looking for what form do they take.
6      You know, so is there a document that you received
7      where they're all written out or something like
8      that?
9  A  Sometimes they would be written out.  Sometimes
10     they would be a slide or some other kind of
11     document.  And sometimes they're just something
12     that's discussed within Corporate Accounts.
13  Q  Okay.  And then so, when you take the KSOs and
14     adapt them to the GPO roles, how do you format-wise
15     go about doing that?  Is that something in writing?
16  A  Sometimes it is, and sometimes similar to the
17     larger team it would be -- normally for us it would
18     be something we have weekly, or we had, I should
19     say, when I was in that role, we would have weekly
20     GPO meetings for the whole team and then weekly
21     one-on-ones with each member and myself to talk
22     through what the priorities were and what our
23     objectives for the year were.
24  Q  So when you say weekly meetings, are you meaning
25     that you met weekly throughout the entire year?

1    A   Uh-huh, yes.

2    Q   Okay.  So the first bullet point under that says,

3        "Specific and measurable actions to be completed,

4        specific steps, targets or metrics to be measured

5        against or specific end products."

6            Would you say that's an accurate way to

7        describe the KSOs as they applied to your team?

8    A   That is -- that does describe what we came up with.

9    Q   Okay.  And so, can you give me some examples of

10       what were the specific immeasurable actions or the

11       specific steps, the targets and metrics that made

12       up those KSOs?

13   A   Yeah, they're typically very broad categories,

14       like, for instance, one might be engage a specific

15       set of key decision makers within the GPO

16       leadership or within key members of the GPO, which

17       would be -- by member mean a hospital network

18       within there, or during COVID, for instance, it was

19       to manage the expectations and the dynamics of

20       COVID demand and supply, which was very

21       challenging.

22           So broad sort of things like that work within

23       our -- or work with the other CADs within the IHN

24       team for specific opportunities.

25   Q   Okay.  And so, am I understanding correctly, then,

1     that these KSOs would be more of -- less of, like,

2     a sales number goal and more of, you know, these

3     are the things that you're going to accomplish this

4     year?

5  A  Yeah, it's not a -- it's typically not a specific

6     number.  There's a revenue component to the ICP

7     plan that deals with that.  So these are typically

8     more general.

9  Q  And so, how in your practice did you track whether

10    throughout the year the employees that you

11    supervised were meeting these KSOs or not?

12  A  That's something that we would talk about in our

13    weekly one-on-ones.  So we would talk about, like I

14    said, what activities they're working on, what

15    their priorities were, what challenges they were

16    running into, and anything that they needed help

17    with.

18  Q  And when you had these weekly one-on-ones, was it

19    your practice to take notes or write anything down?

20  A  Yeah, I typically did take notes of what they -- or

21    their activities were and what they needed help

22    with.

23  Q  And how did you do that logistically, pen and paper

24    or type it out?

25  A  Sometimes it would be pen and paper, and sometimes

1    that percentage score somehow to HR or payroll so
2    the employees could get paid out based on that
3    percentage?
4  A  Yeah, so normally, especially at the year-end
5    process, there was more of a checkpoint at midyear,
6    because the midyear payment was also typically
7    limited to less than the total potential in case
8    someone had a poor second-half performance.  But at
9    the year-end, yes, I would submit what my -- or
10   would review as an entire Corporate Accounts team,
11   we would review everyone's revenue profit, so the
12   measurable parts of their ICP plan.
13       And then we would measure or compare their KSO
14   ratings as a team and sort of calibrate to make
15   sure we were all using the same material and
16   measuring people using the same sort of reference
17   points at the end of the year.
18  Q  Okay.  So when you say calibrate and make sure
19   you're all using the same criteria, how broadly are
20   you talking?
21  A  It's very broad.  So it would -- people would look
22   through what the different -- so this would be --
23   the head of Corporate Counsel would be their
24   leadership team reviewing what they were submitting
25   for all of their team members.  And everyone would

1    review and have a chance to align on places where
2    they felt people were being rated too low or too
3    high.  And there would be sort of a discussion to
4    make sure that we were all on the same page as far
5    as how our teams were being rated.
6  Q  Okay.  And then so, other than this sort of
7    alignment comparison where, you know, if somebody's
8    rating everyone on their team too low or too high
9    or something like that, was there any other process
10   where you would, you know, present for approval the
11   rating for each individual team member that you
12   had?
13 A  That was the process.  So we would all submit it,
14   and then once the head of Corporate Accounts was
15   comfortable with what all the ratings were for
16   everyone on the team -- the broader team, then that
17   would be submitted to the Incentive Compensation
18   team.
19 Q  Okay.  And so, did the head of Corporate Accounts
20   ever come to you at any time and say, hey, I think
21   you're rating people on your team too high or too
22   low?
23 A  Yes, there were instances like that for sure.
24 Q  Okay.  Do you know when that happened?
25 A  I couldn't name specific events, except that the

1    one I remember most specifically was there was a

2    year where I rated Rick Feid relatively low based

3    on a deal in his space that had been challenging

4    and had not had a good outcome that we ended up

5    losing the business.

6        And Ron asked me to -- well, actually, he

7    raised my rating on Rick, because it was not an

8    account that Rick owned.  It was one that he was

9    helping with.

10   Q  Okay.  Any other specific instances you remember

11      where the head of Corporate Accounts either raised

12      or lowered a score that you gave somebody?

13   A  No, I don't remember any others that were -- where

14      they would have impacted an individual's score.

15   Q  Okay.  And so, in H1 of 2018 when you're giving

16      everybody 100 percent, are you basically saying

17      everybody is doing what they're supposed to be

18      doing?

19   A  Yeah, that's -- in our calibration, generally what

20      100 percent would indicate is the people on the

21      team are doing what they're supposed to be doing.

22   Q  Okay.  And then we have the H2 KSO score for 2018

23      in the next column.  And it looks like two people

24      got 105, one person got 103, John Thomson got a

25      96 percent.

1    second half of 2018 on the KSOs, is that -- I mean,
2    how would you rate that score against the broader
3    group?  Is it a pretty good score?  Is it a pretty
4    low score?
5  A  It's a solid score.  You can see there's not a huge
6    deviation, and typically there was not, if I
7    remember correctly, there was -- except in very
8    unique circumstances, there was not a huge
9    deviation among the team -- or broad, I should say,
10   dispersion among the team.  But I think John was --
11   this is a pretty typical finishing point for him.
12 Q  Okay.  And then if we kind of scroll back to the
13   first page of this Exhibit 2, the 2018 review, it
14   looks like John received an overall rating of
15   valuable contribution; is that right?
16 A  Yep.
17 Q  And is that, you know, the best rating that you can
18   get, or is there one above that?
19 A  There's one above that.  The category names have
20   changed year to year, but this would be the middle
21   category where most people are.
22 Q  Okay.  And then how many categories are there below
23   valuable contribution?
24 A  There's one category below.
25 Q  Okay.  So are there only three categories total?

1   A   Yes, it would have been.  Same thing, submit the
2       numbers for the first half and then separate for
3       the second half.
4   Q   Gotcha.  And then so, this indicates that, you
5       know, at the point of the end of half 1 of 2019,
6       each of these four employees are doing what they're
7       supposed to be doing?
8   A   Yeah.
9   Q   Okay.  And then if we flip to the bottom "H2 KSO
10      Scores," we've got some different scores for each
11      of the employees.
12          Do you have any specific memory of where each
13      of these scores came from?
14  A   The one I remember most is John's performance,
15      which he had -- like I mentioned previously, he had
16      three missteps -- significant missteps that year
17      that really hurt him.  And we talked about them and
18      worked through them that year.  And they were
19      subject of quite a bit of discussion.
20          So John had a review of his EAP, which is the
21      Enterprise Account Plan, so basically his Strategic
22      Plan for his accounts and also review of revenue
23      and things like that where he reviewed with the
24      head of Corporate Accounts that did not go well.
25      And then he had an approval process internally for

1    a changed to a Vizient agreement that also went

2    very, very poorly and kind of blew up into a much,

3    much bigger issue than it should have been.

4         And then, I believe, also that same year there

5    was a problem with an activity that we had -- John

6    communicated to the customer before it was agreed

7    internally that we could do it; and it turned out

8    that we could not.  And there was quite a bit of

9    work to figure out an alternative solution that

10   would keep them happy and honor our commitment that

11   John had made.

12 Q  And so, did you give a specific explanation to John

13   about why he was scored at 81 percent for his H2

14   KSO score in 2019?

15 A  No, I would have -- that would have been part of

16   the performance review process.  So all of those

17   issues were discussed at the time that they came

18   up, and they were -- John and I discussed them at

19   length.  But, like I said for prior years, KSOs

20   specifically would not have been -- and the

21   calculation would not have been a conversation that

22   he and I had.  It would have been part and

23   integrated into that performance review process.

24   And we did discuss it at length in the performance

25   review.

1     "Payout by Person FY," it looks to me -- and

2     correct me if you have a different understanding --

3     it looks to me like she received the $30,000

4     Balanced Plan Accelerator.

5         Is that consistent with your understanding?

6  A  Yes.

7  Q  I'm sorry, I missed your answer there.

8  A  Sorry, yes.  There was some background noise here,

9     but it does look like she received it.

10  Q  Okay.  And flipping back to the KSO tab here, do

11     you remember anything specifically about why the

12     rest of the employees were rated at 100 percent for

13     both halves?

14  A  Yeah, this is 2020, I'm just looking up at the

15     title.  So this is first year of pandemic.  And,

16     for the most part, the GPO space went not quiet,

17     but went into emergency mode with their members.

18     And almost all agreements were just automatically

19     extended.  They didn't, for the most part, do any

20     GPO agreements that year.  And the team's focus

21     shifted to handling the COVID questions, the

22     demands and the emergencies within their GPO

23     memberships.

24         So generally there were no GPO contracts or

25     extensions signed that year or not many or not any

1    that were hugely significant.  And that would be
2    consistent with Catherine that year, I believe, was
3    more active than the rest in activity within her
4    actual IHN members to get deals done there.
5         So it was a very quiet year for GPO.  And so,
6    we adjusted everybody almost to 100 percent, since
7    they did what they needed to do, but it was -- that
8    had changed dramatically in April-May time frame
9    from what we thought we would be working on for the
10   year in Q1.
11   Q  Okay.  I will show you quickly what I'll mark as
12      Exhibit 13.  And my question is whether you
13      recognize this as John Thomson's performance review
14      for 2020?
15   A  Yeah, it looks like a printout from the system.
16   Q  Okay.  And then it looks like, if we scroll to the
17      top of page 2, this year you rated John as valuable
18      contribution overall?
19   A  Uh-huh.
20   Q  Okay.  And there's not a lot of details submitted
21      here.
22         Is there anything -- any detail you can
23      remember to add to what we see here?
24   A  Is there any content from either of us this year
25      for John or is this the only document?

1    Q   There's nothing listed under supporting documents,
2        and this is what we have.
3    A   Okay.
4    Q   So I'm not sure if there's anything additional or
5        not.
6    A   Yeah, this is consistent with my recollection of
7        that year, is that the -- because of the strain on
8        the organization, and that people ended up doing
9        dramatically different things that year than they
10       anticipated doing through the year, that there was
11       a company-wide decision not to require or even
12       encourage self-assessments or employee assessments
13       that year, because it was such an outlier and
14       turned out so differently than expected.
15   Q   Okay.  And I'll show you what I'll mark as Exhibit
16       14.  And my question is going to be whether you
17       recognize this as the ICP policy that would have
18       applied in 2020?
19   A   It looks like the policy, or at least it looks like
20       the format that we use.
21   Q   Okay.  But, again, you're not familiar with the
22       details of the ins and outs of that policy?
23   A   Not off the top of my head, no.
24   Q   Okay.  And do you recall in 2020 whether anyone
25       submitted any disputes to you about their KSO

1    ratings?

2  A  No, I don't recall any disputes that were submitted

3    that year.  I think generally everyone was pretty

4    happy, because even outside of Catherine's

5    performance, there was a one-time payment based on

6    COVID performance that year that the entire team

7    got that was pretty significant that was not part

8    of their normal ICP plan.

9        So everyone was pretty happy at the time, and

10    I don't remember any complaints or any protests.

11  Q  Okay.  And do you remember specifically John being

12    pretty happy with his 100 percent KSO rating?

13  A  I don't remember him specifically being happy or

14    dissatisfied with it, but I don't recall -- no, I

15    don't recall either way.

16  Q  Okay.  And moving along to 2021.  I'm showing you

17    what I'll mark as Exhibit 15.  And do you recognize

18    this as the 2021 ICP that would have applied to

19    John?

20  A  Looks like it, yes.

21  Q  Okay.  And, again, if we scroll down to page 5, we

22    see the key sales objectives with an annual

23    component target of $30,000; is that right?

24  A  Looks like it, yeah.

25  Q  Okay.  And then it looks like this year the KSO

1    Q    Okay.  So do you remember anything specifically
2         about these high-rated outliers in each one of
3         2021?
4    A    Yes, these are pretty memorable.  So Rick that
5         year, for part of the year, covered the open
6         position.  So you see Whitney Johnson up above left
7         her position as GPO CAD covering Vizient.  And so,
8         for part of the year Rick covered her territory in
9         addition to his own.  He had covered that customer
10        in the past, so he was familiar with them.

11             And then in another part of the year, he
12        covered a different CAD position, an IHN CAD for
13        Ascension who left the Corporate Accounts team.
14        And they happened to be an account that had what we
15        call a regional GPO that was covered by -- that was
16        Rick's responsibility for the regional GPO.

17             So Rick covered the regional GPO and the
18        associated IHN.  So he covered two open positions
19        that year, that's why he got the higher rating.

20             And then that year for Catherine was the year
21        that she won and got signature on HealthTrust Core
22        Lab, which was a -- she had been working on for
23        about five years and was one of the top three
24        priorities for the company as a whole that year and
25        was a huge competitive win.

John Thomson <john.thomson@roche.com>

## Re: Annual Payout

1 message

---

**Fowler, Jason** <jason.fowler@roche.com>                                    Wed, Apr 17, 2019 at 1:33 PM
To: "Thomson, John" <john.thomson@roche.com>

John - I met with comp team today and reviewed the details of your H2 payout.  I confirmed that the profit payout was 100% and that they underpaid you for KSOs.  The correction has been requested and you should see it after all process approvals are complete, but don't hold your breath for the next pay period.  Keep in mind that ICP and our KSOs are split into 2 halves, so the 100.8% applies to second half only and not the full year (H1 was paid at 100%).  I expect the overall adjustment to be just over $1k before taxes.  Thanks for being vigilant - your question helped identify another payout error as well.

Regards,
Jason


On Thu, Apr 11, 2019 at 12:08 PM Jason Fowler <jason.fowler@roche.com> wrote:
> John - I have made some progress on this, but I will not have an answer for you today.  I have identified what I think is
> the problem, and I am waiting to hear back from the comp team.  Jason

> On Wed, Apr 10, 2019 at 11:03 AM Thomson, John <john.thomson@roche.com> wrote:
>> Jason, please provide an update on where you are with resolving my incorrect annual ICP payout for 2018. As we
>> discussed on February 14, the total payout for achieving plan is $52,000; KSOs account for 80%  and profit for 20%.
>> I was paid a total of $51,126 for year 2018. You told me that I was paid at 100.8% for KSOs, which equals
>> $41,932.80. Subtracting that from the $52,000 equals a payout of $9,193.20 for profitability, which is approximately
>> 98% of profit plan. Based on the payout of others in Corporate Accounts, I know this is not correct.

>> If it is easier for you, please let me know who to contact and I will reach out to them to resolve the error.
>> Thanks,

>> ## John Thomson
>> National Director, Corporate Accounts
>> Roche Diagnostics Corporation
>> 9115 Hague Rd
>> Indianapolis, IN 46250
>> Cell: 770.490.9020

>> *This message is intended only for the use of the named recipient(s) and may contain confidential and/or proprietary*
>> *information. If you are not the intended recipient, please contact the sender and delete this message. Any unauthorized use of*
>> *the information contained in this message is prohibited.*


--

**Jason Fowler**

Director, GPO & Business Operations

Corporate Accounts

Roche Diagnostics

**EXHIBIT     4**
Witness: Jason Fowler
Date: 8/28/23
Dana Miller, RPR, CRR

DD-THOMSON-000054

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION
CAUSE NO. 1:23-CV-00099-SEB-MG

JOHN THOMSON,                        )
                                     )
                Plaintiff,           )
                                     )
        -vs-                         )
                                     )
ROCHE DIAGNOSTICS CORPORATION,       )
                                     )
                Defendant.           )


        The videoconference deposition upon oral

examination of RON DINIZO, a witness produced and

sworn before me, Dana S. Miller, RPR, CRR, a Notary

Public in and for the County of Boone, State of

Indiana, taken on behalf of the Plaintiff, appearing

remotely from Indianapolis, Marion County, Indiana,

on the 29th day of August, 2023, at 9:31 a.m.,

pursuant to the Federal Rules of Civil Procedure.




                CIRCLE CITY REPORTING
                135 North Pennsylvania
                     Suite 1720
                Indianapolis, IN  46204
                    (317) 635-7857

1    A   Yeah, we had restructured at the time.  And we

2        formed an operating model that was referred to as

3        One Roche.  And so, I became the area leader for

4        the Midwest, which encompassed our entire

5        portfolio, our book of business, which was

6        essentially the four main franchises that I had

7        responsibilities for from 2017 until 2019, late

8        2018 or -- yeah, 2016 -- it was two years,

9        essentially, I was in that role.

10   Q   Okay.  And then how did your role change in late

11       2018 or 2019?

12   A   Yeah, I was offered the position that I'm in today,

13       which is Vice President of Corporate Accounts, in

14       mid- to late 2018.  And I accepted that role, and

15       that's the role I'm in right now.  It's my current

16       role.

17   Q   Okay.  And then could you, again, just give us a

18       brief overview of what you do in the VP of

19       Corporate Accounts position.

20   A   Sure.  I have overall responsibility for our top

21       key accounts across the country.  We have a team of

22       approximately 55 individuals right now.  I've got

23       eight leaders and administrator that are on my

24       leadership team.

25           We have overall responsibility for the

```
 1        government segment and a national director that has
 2        responsibilities over the group purchasing
 3        organization segment and the CRO segment, the
 4        clinical research organization segment, as well as
 5        two operations individuals that report in to that
 6        particular leader.
 7    Q   Okay.  And then are you familiar with John Thomson?
 8    A   Yes.
 9    Q   And you formerly worked with John when he was a
10        Corporate Accounts Director; right?
11    A   Yes.
12    Q   And you were not his direct supervisor, but one
13        level above his direct supervisor; is that right?
14    A   That's correct.
15    Q   And so, did you work with John the whole -- until
16        his retirement, the whole time that you're in your
17        current position?
18    A   Yes.
19    Q   And, now, did John's direct supervisor change
20        throughout that time?
21    A   No.
22    Q   And who was his direct supervisor throughout that
23        time?
24    A   Jason Fowler.  Jason was promoted into a new role
25        right around the time that John was retiring.  I'm
```

1   not sure exactly what that timing was.  I don't
2   recall if it was right before he retired or right
3   after, but somewhere around this same time.
4   Q   And how would you describe your professional
5       relationship with John?
6   A   Can you clarify the question or what you're --
7   Q   Sure, yeah.  Would you say you had a good working
8       relationship with John Thomson?
9   A   Yes.
10  Q   About how often did you interact or meet with John?
11  A   In person or virtually or just in general?
12  Q   Both.
13  A   In general, I would say quarterly I would have some
14      type of interaction.  I mean, John was -- would
15      join our -- we have monthly calls with the entire
16      team that he would join.
17          So, I mean, I would see him on those calls and
18      engage there.  Would certainly interact with John
19      when he was in the office.  And then would interact
20      on a situation-by-situation basis depending upon
21      what John may have been working on with his
22      particular account.  But I would say on average
23      that would -- you know, aside from those monthly
24      meetings where I had my entire team part of, I
25      would on average probably say it was probably on a

```
 1        quarterly basis.
 2    Q   And were you ever involved in reviewing John
 3        Thomson's performance?
 4    A   Yes.
 5    Q   How were you involved in that?
 6    A   Annually we -- my leaders go through a rating of
 7        their individual teams, and we -- those ratings get
 8        rolled up to myself and reviewed with myself before
 9        we lock them into our HR system.  So those would be
10        the general touch points.
11            Also, on an annual basis we have a succession
12        planning process that we go through where we, you
13        know, look for individuals that are -- you know,
14        that are interested in moving into new roles that
15        have potential additional growth and development in
16        the organization, have the will, the skill and the
17        mind-set that want to do more within our -- within
18        the Roche organization.
19            So there's also a succession planning process
20        that my leadership team and I go through that's
21        usually on an annual basis as well.
22    Q   And so, did you go through that succession planning
23        process for John Thomson specifically?
24    A   I don't recall.  Those -- I don't believe John was
25        an individual that was interested in moving into
```

1    the GenMark part of our business.

2         We have another KSO around LIAT, which is a

3    point-of-care device that we sell.  And we want to

4    expand the presence and the footprint of that

5    solution out into the marketplace with our

6    customers who we have a key selling objective

7    specific to LIAT.  So those are what we refer to as

8    key selling objectives.

9  Q  And are the KSOs all the same?  For example, would

10   John Thomson and all of his peers on the GPO team

11   have the same KSOs?

12 A  They should be very, very similar, yes.

13 Q  And so, are the KSOs completely unrelated to sales

14   numbers?

15 A  No, I would not say that, in the sense that the

16   KSOs are designed to drive our sales numbers and to

17   drive sales.  So in that sense, they're related.

18        There's not an actual -- yeah, no, that's how

19   I would probably describe it.  They are -- they're

20   related.

21 Q  Okay.  And so, if somebody had lower revenue

22   numbers, would that affect their KSOs?

23 A  Lower revenue numbers?  It could, but it would

24   depend upon the situation.

25 Q  So can you give me an example of a situation where

1    for the year.  And then since we cover the entire

2    enterprise, what we will look at then at a

3    Corporate Counsel Leadership team, we'll look at

4    each of the individual franchises to determine what

5    one or two areas might we focus on for each of the

6    franchises.  And from that we try to come up with

7    three or four, no more than five KSOs for our

8    teams.

9  Q  So during the year, when does this process of

10   coming up with the three to five KSOs for each team

11   happen?

12 A  It happens at the beginning of the year.  And,

13   actually, we start working on them in the fourth

14   quarter of the prior year.  Once the business plans

15   are finalized and the priorities are set by the

16   franchises, we'll then finalize the key selling

17   objectives usually early in the year, so somewhere

18   in that.

19      If they're not finalized before the year

20   starts, shortly after the franchise teams align on

21   their priorities, we'll try to have all that

22   finalized within the first quarter of the year, and

23   the earlier the better.  So we try to get them out

24   by January or February.

25 Q  And so, when you say you try to get them out, are

1    you trying to get them communicated to the
2    employees who they apply to?
3  A  Yeah, it's part of the incentive comp plan.  So
4    there's certain state regulations that we have to
5    have them rolled out to, and I believe California
6    is the main one, that by the end of January we have
7    to have the individuals that work in California or
8    that cover California accounts, the incentive comp
9    plans rolled out.
10     So as part of rolling out those incentive comp
11    plans, the -- you know, the KSO is a component of
12    that.  So we try to have all that wrapped up by
13    then or at least in place.  There might be, you
14    know, a KSO here or there that -- you know, that's
15    not fully defined, but that's usually done
16    within -- it should be done by the time we roll out
17    the incentive comp plan.
18  Q  And so, the KS -- the specific KSOs are not
19    actually defined in the incentive comp plan; right?
20  A  That is correct.
21  Q  And so, is there a different document where these
22    specific KSOs are actually defined?
23  A  Yeah, those -- yes.  So we have a KSO -- I don't
24    know if I'd call it a document, but, you know, we
25    have our -- yeah, we have a KSO template, if you

1    will, that we'll roll out separately from the

2    incentive comp plan that have the details.  And

3    each of the teams will roll those out to their

4    individual teams.

5         I think I mentioned this, but the KSOs can be,

6    and usually are, slightly different between the

7    individual teams.

8  Q  Okay.  So the managers of each of the individual

9    teams would have some input into what the KSOs are

10   for their team?

11 A  Yes, yeah, along with input from the franchise

12   priorities as well.

13 Q  Okay.  But they all generally follow this template

14   that you mentioned?

15 A  Yes, yes.

16 Q  And so, is it the case, then, that, you know, the

17   template goes to the manager of the individual

18   teams who kind of finalized the specifics for their

19   team, and then that goes back up to your level for

20   approval?

21 A  Can you repeat that?

22 Q  Sure.  So you mentioned that the individual

23   managers of the teams would have some input into

24   the KSOs.

25        Once the managers of the individual teams

1   A   Uh-huh.

2   Q   And so, how were those percentages assigned to each

3       individual team member?

4   A   Yeah, we pay out KSOs twice a year, midyear and at

5       end of year.  Each of the managers go through a

6       rating of assigning the percentages to their

7       individuals on their teams.

8           They roll that up to myself.  I review that

9       before submitting it to our Compensation team for

10      processing and payout.  And then prior to us --

11      once the Compensation team has processed all of the

12      individuals on the Corporate Accounts team and all

13      my leaders' teams, we take a -- we use an average

14      of their team scores for the leaders, actual

15      scores, and then we also have a sign-off process.

16          So I have a meeting with my finance partner

17      and my HR partner, and we review the KSO ratings

18      and scores of the entire Corporate Accounts team

19      before the three of us actually sign off on them.

20  Q   And what are the names of those two individuals

21      that you said you review those with?

22  A   Nicole Shaw is my finance partner, and I'm having a

23      blank right now on my HR partner.  She's not going

24      to like that.  Stacey Fout, there.  Stacey Fout is

25      my HR partner.  Oh, my gosh, I just had a quick

1    conversation with the manager about any particular

2    individual unless there's some sort of question

3    about an outlier or something like that?

4  A  No, I will have a conversation or two with my

5    leaders as they roll theirs up.  Generally they

6    like to at least socialize their ratings with me

7    before we get to that sign-off meeting.

8         So, yeah, there's generally a conversation

9    that has occurred with each of my leaders.

10 Q  So is it pretty common for employees to be rated at

11   exactly 100.0 percent?

12 A  It is common that from a KSO perspective we try

13   to -- we generally have members that are at --

14   usually right at plan or slightly above plan or in

15   some cases slightly below the plan.  But, in

16   general, we try to -- because our positions are

17   more long-term and they're more strategic in

18   nature, and they're not like our franchise -- other

19   franchise sales positions that get immediate

20   payouts from signing contracts and signing deals,

21   our positions are more longer term that we take

22   with our accounts and more strategic in nature.

23        And so, the KSO is one where we -- you know,

24   we tend to try to compensate people as much as

25   possible and try to get them at their target payout

```
 1        for the KSO payout component.  And then --
 2    Q   Was there ever --
 3    A   And then our top performers, the performers that
 4        have done really exceptional or have accomplished
 5        some really significant objectives, then we will
 6        reward them as such as well.
 7    Q   And how are they rewarded?
 8    A   Through a higher KSO score.
 9    Q   Was there ever a time you reviewed the KSO
10        percentages that Jason Fowler assigned and you
11        ended up making changes to those percentages?
12    A   There were times where I have questioned his rating
13        in his score, yes -- or his roll-up of his team
14        scores where I felt a couple of individuals on the
15        team were -- I know specifically we had
16        conversations around two individuals on his team.
17    Q   Who were those individuals?
18    A   Catherine Boik and Rick Feid.
19    Q   And what were those conversations about?
20    A   Catherine's was around a significant achievement
21        around securing a contract position for Roche for
22        the first time ever in our Core Lab franchise,
23        which opened up access for us to go into over 1,200
24        hospitals across the country, which we had never
25        had access to.
```

1    So it opened up 20 percent of the market for
2    us, which were a direct contribution -- you know, a
3    direct result of her efforts over several years to
4    get us to that point.  And I felt like, and as did
5    Jason, that she needed to be recognized as such for
6    a much, much higher KSO score for that particular
7    year.
8        For Rick Feid, we had -- Rick was covering
9    multiple accounts at the time.  So we had a
10   promotion of an individual who was on our Premier
11   team moved into a different role in the
12   organization.  So we asked Rick to step in to not
13   only cover his accounts and his responsibility, but
14   also to pick up another individual's workload.  And
15   felt like his -- you know, his effort there should
16   also be recognized.
17 Q  And so, how were the actual percentages determined?
18   I mean, is it kind of an arbitrary assignment, or
19   is there anything measurable that you can add up
20   and get to the percentage numbers?
21 A  In general, the KSO scores are subjective in
22   nature.  So it depends -- again, depending upon --
23   there are a couple that are more quantifiable in
24   nature, but in general they are subjective.
25       So when they -- when we do roll them up, it's

1    other means in the organization for other, you
2    know, policy questions and concerns.
3         There's our HR which is now called Our People
4    In Culture, but HR is certainly a route to the
5    voice -- you know, voice any concerns.  But
6    generally I would expect the team would -- or an
7    individual would at least have a conversation with
8    their direct manager.  Their manager would come to
9    me or within Corporate Accounts.
10        It's not out of the question for individuals
11   to come directly to myself to, you know, have
12   conversations or to voice a concern.
13 Q  And so, that has happened before where an
14   individual has come to you to voice a concern about
15   their KSO numbers?
16 A  It may have.  I don't recall right off the top of
17   my head.  It's not a -- they're not -- it's not
18   like I have people coming to me every day or
19   multiple times a year.
20        But over the last five years if somebody's --
21   you know, may have approached me across our team
22   with a question or two relative to our compensation
23   plan, then a question could have been specific to
24   the KSO component.
25 Q  And do you remember any instances where a manager

1      talking to Jason around, you know, why John was

2      scored where he was.  And from what I recall, I was

3      completely aligned with John's scoring of his KSOs

4      at the time we signed off on them and even during

5      this follow-up conversation that occurred at a

6      later time with Jason.

7   Q  Did you review John's KSOs from that year or

8      previous years?

9   A  I believe I had seen a summary, a roll-up of his

10     KSO scores over time, yes.  Looking at them over

11     time, yes, I did.

12  Q  And did you do anything to look back at whether

13     those scores were appropriate?

14  A  Yeah, we looked back at his performance during that

15     time.  And I had concluded at the time that the

16     ratings and the scoring was more than adequate for

17     John's performance.  If anything, I felt like it

18     was probably higher than what maybe he probably

19     should have been rated.

20  Q  Why did you feel it was higher than what he should

21     have been rated?

22  A  Based upon feedback that I'd received throughout

23     the time in my role, around feedback specifically

24     from the Franchise teams, around -- there's

25     individuals who didn't even know who was actually

1     covering the Vizient account for us, leaders, peers

2     of John's, as well as some of the senior-level

3     franchise sales leaders.  As well with the

4     directors and VPs providing feedback around John's

5     lack of engagement and his collaborating and how

6     he -- you know, how he worked or, you know, wasn't

7     collaborating and aligning as well as maybe others

8     on our team were doing at the time.

9  Q  So why did you approve a KSO score or scores for

10    John Thomson that you felt might have been too

11    high?

12  A  It's a good question.  I think, you know, in the

13    sense of, you know, it's a decent part of

14    compensation.  And, you know, I know that -- you

15    know, I was looking at John's total body of work

16    and his total value to the organization and, you

17    know, his -- you know, he's had some -- he had some

18    very decent years for us in his tenure.

19        And not wanting to demotivate him and wanting

20    to, you know, compensate him for some of those

21    long-standing relationships that he had maintained

22    for us within the Vizient organization.

23  Q  So then weren't you essentially compensating him

24    based on something that wasn't an annual KSO?

25  A  No, not necessarily.  I mean, I think we rated him

1    A   I've been involved with -- we have exceptions for

2        our incentive comp, yes.  And I have been involved

3        in discussions relative to exceptions, many -- not

4        many exceptions, but exceptions over my tenure and

5        my roles within Roche.

6    Q   Okay.  And about how many do you think you've been

7        involved in?

8    A   Two or -- maybe two or three a year.

9    Q   Okay.  And so can -- are you able to recall, you

10       know, just in general what type of exceptions those

11       were?

12   A   Sure, sure.  And there's a process here by which,

13       again, HR, the Compensation Team and Legal -- I'm

14       sorry, not Legal, at one point we had -- I think we

15       did have Legal part of that, but I believe it

16       was -- I believe it's Finance, HR, myself and our

17       Compensation team.

18           If there are exceptions that are submitted

19       throughout the year, they occur at the end of each

20       quarter, there's an opportunity for employees to

21       submit an exception.  Those exceptions then get

22       rolled up to my -- to this team, and we have an

23       exception meeting.  And there will be decisions

24       that were made, whether we grant the exception or

25       don't grant the exception, based upon whether or

1    not this is something we've done in the past, and

2    there's already precedent set.

3         We may grant an exception, or if an exception

4    is presented and we have concern about setting

5    precedent, and we don't want to particularly do

6    this because it has broader implications or creates

7    more risk, for whatever reasons, then we -- you

8    know, we would deny an exception.

9         So I would say those are -- the number of

10   exceptions, if you looked over time, I don't have

11   it off the top of my head, but I think we've gotten

12   to fewer and fewer exceptions over the years.

13 Q  Okay.

14 A  And I'm sure our Compensation team can walk you

15   through more details for what those exceptions look

16   like and how many there are, etc., etc.  But I'm --

17   the most recent was midyear this year, and our

18   first quarter I don't believe we had any exceptions

19   even submitted.

20 Q  Okay.  And so, in these exceptions that you've been

21   involved in, are a lot of those, would you say,

22   calculation errors, or is it something else?

23 A  No, they're usually something else.  They're

24   usually related to we want to give somebody -- you

25   know, somebody's asking for goal relief, or

1      somebody had a situation occur in their territory

2      where their -- they were not getting the full

3      revenue for a particular -- you know, that should

4      have been included into their -- you know, into

5      their calculations.  We -- yeah, those are more the

6      type that we typically would see.

7   Q  Okay.  And then so, are they generally calculation

8      questions, or do you ever get payout exceptions for

9      something, you know, rather than being calculation

10     related, it's more like I think my manager is

11     rating me too low?  No?

12  A  No, they're not related to I think my manager is

13     rating me too low.  They're related to this

14     particular account was not factored in.  It was not

15     part of my territory, but it really is, that sort

16     of thing.  We -- yeah, yeah.

17  Q  Okay.  So it's more of addressing questions about

18     what goes into the calculation?

19  A  Or what goes out.

20  Q  Got it.  Okay.  And so, I do want to look quickly

21     at what's been previously marked Exhibit 16.  This

22     is an Excel document.

23        And is this something that you've seen before?

24  A  Yes.

25  Q  Okay.  And so, is this a summary of what was paid

1    exception process to pay Catherine what she was
2    paid in 2021?
3  A  I believe I shared that the cap was 125 percent,
4    but that cap was increased to 150 percent.  And so,
5    during the review and sign-off of that year's KSO
6    scores, yes, I had a conversation with our HR team.
7    I had a conversation with the Incentive Comp team.
8    And I had a conversation with our finance partner
9    around her score and why it was justified.
10 Q  Okay.  And then she was paid out at the 150 percent
11   that year; right?
12 A  She was paid out -- I believe if you go back to the
13   numbers, she was paid out the first half of that
14   year at 150 percent.  The second half of the year,
15   I believe it was a lower payout, if I'm not
16   mistaken.
17 Q  So for the first half she was paid out the
18   150 percent?
19 A  Yes, that's what you just reviewed in that Excel
20   spreadsheet.
21 Q  So going back to John Thomson's specific
22   contributions and re-signing the contracts over his
23   last few years before his retirement, so if a
24   person already has all the businesses that Roche
25   wants under contract for a certain year, then is it

```
 1       years where his KSO rating would warrant a rating
 2       above 100 percent?
 3    A  No.
 4    Q  From 2018 to 2022, was Mr. John Thomson performing
 5       in any of those years to warrant an accelerator in
 6       any of those years?
 7    A  No.
 8    Q  How would you describe Mr. John Thomson's work
 9       performance from 2018 to 2022, once you came into
10       your position, I think, around the middle of 2018?
11    A  John's performance, I think, was average, in my
12       opinion, I think at best.  There are many other
13       individuals on our Corporate Accounts team that
14       were performing and continuing to perform at a
15       higher level than John.  I think John's
16       compensation was more than adequate for his results
17       and for his body of work.
18    Q  Due to his tenure and knowledge of the department,
19       was there any doubt that he understood the
20       accelerator and KSO programs from 2018 to 2022, in
21       your mind?
22    A  Not in my mind.  He had been an employee for many,
23       many years in our organization under the incentive
24       comp plans year over year.
25               So, in my opinion, John was -- very well
```

John Thomson <john.thomson@roche.com>

---

## Re: KSOs

1 message

---

**John Thomson** <john.thomson@roche.com>                                       Tue, Mar 8, 2022 at 3:15 PM
To: "Fowler, Jason" <jason.fowler@roche.com>

Thanks Jason. What I am looking for is how you determine what the payout will be for KSOs since I/we have not had KSOs for the last 4 years. Do you just give Ron the percentage payout without any KSO documentation?

**John Thomson**
National Director, Corporate Accounts

Roche Diagnostics
9115 Hague Rd
Indianapolis, IN 46250

Phone: 770.490.9020

**EXHIBIT   20**
Witness: Jason Fowler
Date: 8/28/23
Dana Miller, RPR, CRR

Mail: **John.Thomson@Roche.com**

www.roche.com

**Confidentiality Note:** This message is intended only for the use of the named recipient(s) and may contain confidential and/or proprietary information. If you are not the intended recipient, please contact the sender and delete this message. Any unauthorized use of the information contained in this message is prohibited.

On Tue, Mar 8, 2022 at 2:45 PM Fowler, Jason <jason.fowler@roche.com> wrote:
Hi John,

Working to track down prior years, but here are the details of your KSO components for 2021, and I am working to track down prior years:

DD-THOMSON-000063

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

3/9/22, 12:50 PM                                Roche Mail - Re: KSOs

| KSO | KSO Weight | Thomson |
|---|---|---|
| 1) COVID Portfolio support & execution | 20.0% | 100.0% |
| 2) Strategic engagement with GPO & Key Members | 40.0% | 100.0% |
| 3) Engagement with local sales teams, utlization of Roche resources | 40.0% | 100.0% |
| **Total H1:21 (Paid in Q3 2021)** | **100.0%** | **100.0%** |

| KSO | KSO Weight | Thomson |
|---|---|---|
| 1) COVID Portfolio support & execution | 20.0% | 100.0% |
| 2) Strategic engagement with GPO & Key Members | 40.0% | 100.0% |
| 3) Engagement with local sales teams, utilization of Roche resources | 40.0% | 100.0% |
| **Total H2:21 (Paid in Q1 2022)** | **100.0%** | **100.0%** |

Jason

On Fri, Mar 4, 2022 at 11:47 AM Thomson, John <john.thomson@roche.com> wrote:
Hi Jason, For the last 4 years, how was my payout for KSOs determined? You have never shared with me how you calculated the payout. Do you have any documentation that you can share with me?
Thanks,

**John Thomson**
National Director, Corporate Accounts

Roche Diagnostics
9115 Hague Rd
Indianapolis, IN 46250

Phone: 770.490.9020

Mail: **John.Thomson@Roche.com**

www.roche.com

**Confidentiality Note:** This message is intended only for the use of the named recipient(s) and may contain confidential and/or proprietary information. If you are not the intended recipient, please contact the sender and delete this message. Any unauthorized use of the information contained in this message is prohibited.

--
**Jason Fowler**
National Sales Director, Corporate Accounts

Roche Diagnostics
Indianapolis, IN 46256

DD-THOMSON-000064