# EXHIBIT A

Page 1

1           UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF INDIANA
2               INDIANAPOLIS DIVISION
3          Case Number 1:23-CV-00099-SEB-MG
4

JOHN THOMSON,                          )
5                                      )
                          Plaintiff,   )
6                                      )
            -vs-                       )
7                                      )
ROCHE DIAGNOSTICS CORPORATION,         )
8                                      )
                          Defendant.   )
9
10
11
12
13          REMOTE DEPOSITION OF JOHN THOMSON
14
15
16
17

            The remote deposition upon oral examination
18   of JOHN THOMSON, a witness remotely sworn by me,
     Tara Gandel Hudson, RPR, CRR, a Notary Public in
19   and for the County of Hancock, State of Indiana,
     taken on behalf of the Defendant, with the witness
20   located in Roswell, Fulton County, Georgia, on the
     8th day of September, 2023, scheduled to commence
21   at 9:30 a.m., pursuant to the Federal Rules of
     Civil Procedure with written notice as to the time
22   and place thereof.
23
24
25

```
                                            Page 6
 1   Q   Finally, if you don't understand my question, if
 2       you need me to explain something, repeat
 3       something, just speak up.  Okay?
 4   A   Okay.
 5   Q   So let me ask you, how's your health today?
 6   A   Very good.
 7   Q   Okay.  And are you on any prescription
 8       medications that could impact your ability to
 9       testify truthfully?
10   A   No.
11   Q   Okay.  Let me ask you, just so I understand it
12       to take some of the issues -- what remedies are
13       you seeking from this lawsuit?
14   A   To be paid for the KSOs that were never
15       developed.
16   Q   Okay.  And that's it?  As to the compensation,
17       aside from maybe your attorneys would make
18       claims for attorney fees or something like that,
19       but from you, your damages specifically, is the
20       KSO from 2018 to 2022?
21   A   Correct.
22   Q   And --
23   A   For me personally, yes.
24   Q   Just so we're clear, you're not alleging or
25       seeking any damages for pain and suffering or
```

```
                                                  Page 7

 1        emotional harm or anything like that?

 2    A   That is correct.

 3    Q   Okay.

 4            MR. CAMPBELL:  Anna, is all that correct --

 5        I want to make sure I don't have to go into some

 6        of the other issues.

 7            MS. CONKLIN:  That's correct.  The wage

 8        claim statute damages, but no pain and suffering

 9        or emotional damages.  That's correct.

10            MR. CAMPBELL:  Okay.  I want to make sure

11        so I didn't have to go through those points as

12        to it.

13    BY MR. CAMPBELL:

14    Q   Mr. Thomson, let me just ask you -- and I guess

15        just finally, you retired from your employment

16        with Roche; right?

17    A   January 16 of this year.  Correct.

18    Q   And that was a voluntary decision?

19    A   Yes.

20    Q   You're not in this lawsuit, you're not alleging

21        that your retirement was in any way unlawful or

22        forced or anything like that?

23    A   That is correct.

24    Q   This is from 2018 to 2022 the KSO, as we call it

25        under the incentive compensation plan; is that
```

Page 9

1   Q   Okay.  So let me move onto some of the other

2       points as to this.  Let me ask you about the

3       incentive compensation plan.  We're going to go

4       through each of the years and look at it.

5           Have you determined an amount that you are

6       seeking under those years?

7   A   We really haven't -- I would say no.  Not

8       explicitly.  Although -- so when you say for all

9       the years, let me make sure.

10  Q   All or each year.  Either one.

11  A   Anna and I have talked about -- floated numbers.

12  Q   I don't want to know what Anna did -- just to be

13      clear, if you have to say, "I talked to Anna

14      about this or did that," that's something that

15      I'm not entitled to get.  I'm just saying to

16      you, if you have a number as to it, "yes" or

17      "no" as to it.

18  A   No.

19  Q   I don't want to know that you told Anna, Hey, it

20      should be this or that.

21  A   No.

22  Q   You don't know an amount for even like a year or

23      overall, you don't know either one?

24  A   I would say the maximum payout would be the

25      maximum amount.  Yes.  So if I understand your

Page 10

1   question, yes.
2   Q   So it's your position in this lawsuit that you
3       were performing to the level that you should
4       have gotten a maximum payout from 2018 to 2022?
5   A   Well, so I think I know in listening to the
6       depositions of Jason Fowler and Ron DiNizo, if
7       we had KSOs, I do believe I would have.  But we
8       never had KSOs.  So everything was completely
9       subjective.  So yes, I do.  But we never had
10      KSOs.
11  Q   Okay, okay.  Let's go through a little bit.  How
12      long were you employed by Roche?
13  A   43 and a half years, my entire professional
14      life.
15  Q   What was your final position that you held?
16  A   I think they call it a corporate accountant
17      director for GPOs.
18  Q   Say that again so the record is clear.
19  A   Corporate account director, group purchasing
20      organizations.
21  Q   How long did you hold that position?
22  A   Well, I've been involved with group purchasing
23      organizations for approximately 15 years, but
24      there's several of them, and I have been
25      involved in different ones.  This current

```
 1        position has been longer -- I'll be honest, I
 2        don't recall.  It's been prior to 2018.
 3   Q    Okay.  Any idea whether it was five years prior,
 4        one year?  Any idea about that?
 5   A    It depends on how -- let's see if I understand
 6        the question.  Again, I focused at least the
 7        last five or six years on Vizient which is the
 8        largest national GPO.
 9             Prior to that, I did them all by myself
10        during a certain time period.  I also worked
11        with Premier, the second largest GPO.  I worked
12        with Health Trust, the third largest over the
13        course of the last 15 years.  So Vizient, I
14        would estimate to be between five and seven
15        years.
16   Q    Let me ask it this way.  We're going to be
17        talking about the incentive compensation plan
18        during this --
19   A    Yeah.
20   Q    -- deposition.
21             I know you know where I'm going.  Just give
22        it a second for me to complete the question and
23        then you answer.
24             So how long -- how many years prior to your
25        retirement were you eligible to earn additional
```

```
                                            Page 12

 1      compensation beyond your salary under the
 2      incentive compensation plan?  Are we talking 15
 3      years, 20 years?  How many years were you
 4      eligible under that plan?
 5   A  So Roche defines it, if I understand your
 6      question correctly, how long have I been
 7      eligible for some type of incentive pay for -- a
 8      sales position was called incentive comp.  For
 9      nonsales positions such as marketing positions
10      that I've had, it's called an annual bonus.
11          So are you looking for how long I've been
12      eligible for either one?
13   Q  Why don't you start there.
14   A  35 years, probably.  Estimate.
15   Q  How long were you under the sales side of it?
16   A  Since 2017, I believe.  No, I'm sorry.  I'm
17      sorry.  Correct that.  1997.
18   Q  Okay.  So over 25 years, you were under a -- you
19      were a sales employee governed by an incentive
20      compensation plan?
21   A  Correct.
22   Q  And just so the record is clear, the incentive
23      compensation plan in simple terms, you were paid
24      a salary; right?
25   A  Correct.
```

Page 13

1    Q    And the incentive compensation plan made you

2         eligible for group and individual incentives

3         that paid you beyond your base salary?

4    A    Yes.

5    Q    When we talk about "group," it would be looking

6         at your department or area.  There's some group

7         of employees beyond you that would be purely

8         objective; right?

9    A    Yes.  For things such as revenue, for profit.

10        Yes.

11   Q    Okay.

12   A    Many of us had those metrics, yeah.

13   Q    That would be you and your team, so to say, I'll

14        use for this deposition, that's entirely

15        objective, Did we meet our sales goal?  Did we

16        meet our revenue?  Whatever those are.  And you

17        and the rest of the team members would be paid

18        out under that group incentive; right?

19   A    Correct.

20   Q    The KSO, what does "KSO" mean?  What's that an

21        acronym for?

22   A    Key sales objectives.

23   Q    How long did you have --

24             And the key sales objectives are more

25        individualized; right?

Page 14

1    A    Yes.

2    Q    The key sales objectives, as we heard, are very

3         subjective versus, Hey, you meet a revenue goal

4         of X.  It's more subjective as to, Are you doing

5         your job and going beyond it; right?

6    A    Would not call them subjective.  If you look at

7         the incentive compensation plan, it's supposed

8         to be specific and measurable for the

9         individual.

10   Q    Okay.  So you think it was objective and

11        specific and measurable, is your position?

12   A    Yes.  That's how they are designed.  Yes.

13   Q    Okay.  I just want to have your testimony.

14            So, Mr. Thomson, as to the KSO, how long

15        were you eligible for a KSO?  Was that from that

16        1997 that you had that portion of compensation

17        as part of your incentive compensation plan?

18   A    I don't know if we called them KSOs back then or

19        not.  They used to be called MBOs.  They are

20        some form of measurable and specific metrics

21        that you were to achieve.

22   Q    Let's group them this way.  Since 1997, you had

23        in addition to your salary, you were a sales

24        employee at Roche, and you had in addition to

25        salary, you could earn additional compensation

```
 1       through group incentives; right?
 2   A   Define "group" for me.  Maybe I'm not
 3       understanding that.
 4   Q   We'll certainly look at the plan and your
 5       compensation, but Roche would look at whatever
 6       your department group -- the sales objectives
 7       that we talked about; right?  You talked about
 8       revenue or sales; right?  It wasn't just you?
 9       There was some group or department; right?
10   A   That is correct.
11   Q   Okay.  I'm not trying to be difficult.  I'm just
12       trying to narrow things down.
13   A   I just want to be clear.  Yeah.
14   Q   To be clear, so the first aspect since 1997, you
15       were eligible under the incentive compensation
16       plan that was applicable to you for some
17       group-wide incentive; right?
18   A   Yes.  Depends how you define "group," but yes,
19       I've been in corporate accounts since 1998.  So
20       yes.  If that's the group you're referring to,
21       yes.
22   Q   Okay.  Let's make it simple for you so we don't
23       have to have a dispute later on.
24           The group would be your corporate accounts;
25       is that what you're saying?  They would look at
```

Page 16

1       the corporate accounts, employees, to see if you

2       met the overall revenue or sales goals or

3       increase from the prior year; right?

4    A  Yes.

5    Q  So since 1997, you said you moved in in 1998

6       into the role.  For about 25 years, close to,

7       before you retired, you were eligible for and

8       received, I'm assuming most years, that group

9       incentive under the incentive compensation plan;

10      right?

11   A  Yeah, just to be clear.  So in 1997, I moved

12      down to Atlanta for a job not within corporate

13      accounts.  I was then promoted in 1998 to a

14      corporate accounts position, but it was not for

15      group purchasing organizations.

16   Q  Okay.  Mr. Thomson, we might be here for eight

17      hours if we get onto this.  I'm just trying to

18      say for over 20 years, you were in a position

19      eligible for a group incentive under the

20      incentive compensation plan; right?

21   A  Yes.

22   Q  Okay.  I'm really -- I'm just trying to do it.

23      If we're arguing about '97, '98, we will be here

24      forever.  I appreciate you being specific, but

25      we're being very specific on issues that really

Page 17

1    aren't that specific.

2         Let's talk about the other portion of the

3    incentive compensation plan.  For over 20 years,

4    the last 20 years of your employment, they

5    weren't always called KSO, but you were eligible

6    for what we're saying in this deposition for

7    some individual incentive under the incentive

8    compensation plan; right?

9  A  It's what I recall.  Again, I haven't gone back

10   and reviewed every incentive comp plan since

11   1997.

12 Q  Understood.  But you do recall that your

13   compensation as a sales employee did include

14   some type of both group incentive and individual

15   incentive; right?

16 A  That is correct.  Yes.

17 Q  And as to those incentives, you -- at Roche,

18   let's talk a little bit about Roche as to it.

19   Long-term employee, 43 years.  I'm assuming you

20   were very familiar with all of the various

21   complaint procedures that you had available to

22   you at Roche; right?

23 A  I'll say I wasn't because I never really had any

24   complaints.

25 Q  Okay.

Page 18

1    A    Until Jason Fowler.  Yeah.

2    Q    Let's talk about it.  Certainly, if in 2010 you

3         thought somebody was giving you discipline that

4         wasn't appropriate, you knew how to figure out

5         who to go and complain to; right?

6    A    I would go to my manager, yes.  It was typically

7         about miscalculations.

8    Q    If your manager didn't satisfy -- I'm --

9              Mr. Thomson, I'm trying to say if you

10        thought your manager -- let's say you thought

11        your manager in 2010 was discriminating against

12        you based on your age and was holding you to

13        different standards than your co-workers, you

14        could go to human resources; right?

15   A    Yeah.  I'm sure I could have, yes.

16   Q    You, as a long-term employee, could find the

17        various complaint procedures available to you at

18        Roche; right?

19   A    I'm sure I could if I dug deep enough, yes.

20   Q    Well, dug deep enough.  You had access to all

21        the policies and procedures and manuals on your

22        Roche computer; right?

23   A    Correct.

24   Q    Okay.

25   A    That talk about the calculations of KSOs or the

Page 25

```
 1   A   No.  I'm going to retire someday.  I didn't have
 2       a date set, no.
 3   Q   You're asking for payout.  I take it the payout
 4       meant you were leaving.  You were retiring, and
 5       you wanted a payout.
 6   A   Yes, I would -- I'm sorry to interrupt you.
 7           Yes.  I would leave because it was my
 8       belief that you didn't need four GPO people.
 9       You needed three.
10           It would be in the interest of the company
11       to move that into a more revenue-producing
12       position.
13   Q   Well, my question is -- well, let's take a step
14       back.  When did you announce your retirement?
15   A   August 31.
16   Q   And I can't imagine you made the decision on
17       August 30.  When did you make the decision that
18       you were going to be retiring at the end of
19       2022?
20   A   It's really the beginning of 2023.
21           However, I don't remember exactly.  All I
22       know is when I talked to Ron, I had no firm date
23       in mind.  So I was going to give as much notice
24       as possible.  That's why I gave, what, four
25       months' notice that I was retiring.  It was
```

Page 26

1       sometime in the summer.  I said, Okay, I'm ready

2       to go.

3           A lot had to do with a big contract.  I was

4       negotiating contracts with Vizient that were

5       worth over $2 billion over the five-year term of

6       these agreements.  So I wanted to complete those

7       before I retired.  And two out of three I did

8       complete.  The third one was postponed.  I

9       wanted to leave Vizient in very good shape.

10   Q   When you went in to talk to Ron in March of

11      2022, you went in with a proposal that Roche

12      would pay you additional compensation to have

13      you retire and leave with your retirement

14      benefits; right?

15   A   A severance package, correct.

16   Q   You didn't go in and say, Hey, 2021, I should

17      have earned this.  You went in and said, I want

18      an additional sweetener to my retirement; right?

19   A   Let me think about that.  So, I mean, again, the

20      whole purpose of the call was to communicate

21      that for five years we didn't have specific and

22      measurable KSOs.  Remember that according to the

23      policy, that Jason -- the way it works is, the

24      objectives come down from senior management.

25      They filter all the way down.  Jason's job was

Page 28

```
 1        you proceeded to utilize all of your PTO; right?

 2        You didn't work much over your final six months

 3        of employment; right?

 4    A   That is not an accurate statement.

 5    Q   What is accurate?  How many PTO days did you

 6        take in 2022?

 7    A   Let me tell you what happened.  So on August --

 8    Q   No.  My question to you, John, is -- first of

 9        all -- here's what I would say.  I'm going to

10        ask you the questions.  You're going to answer.

11        If you want to then say, I've answered your

12        question, and I want to say more, you're free to

13        say whatever you would like.  Okay?  But right

14        now, I want to know how many PTO days, vacation

15        days did you take in 2022?

16    A   I don't have that information.  I can give you

17        an educated guess.

18    Q   Okay.  Why don't you give us that.

19    A   So I believe I had over 60 days accrued plus

20        what I would earn until January.  I initially

21        told Jason that I was going to do this.  He told

22        me HR would never agree to it.  He then told me

23        he was moving onto a different job.  So I didn't

24        want to leave Ron in a bad situation, so I

25        took -- if I had to guess, between 20 and 25 of
```

Page 29

```
 1        those days between September and January 16.
 2             Ten of those days were for a vacation to
 3        Spain and Italy.
 4   Q    So we took the vacation for the year.
 5             Then let's just talk --
 6             So your issue that you took to Ron was an
 7        overall issue from 2018 to 2021, I guess, or
 8        even 2022, and saying, I'll leave if you pay --
 9        do you know what your demand was?  What did you
10        ask Ron for as the sweetener?
11   A    Standard severance package.
12   Q    So you just wanted a standard severance package,
13        meaning, Treat me as if you're eliminating my
14        position, is what you're saying?
15   A    That's exactly right.
16   Q    So that's why you told me that you were raising
17        with Ron, You don't need this many people in
18        corporate accounts.  Why don't you eliminate my
19        position and give me a severance?
20   A    You don't need this many people in corporate
21        accounts for GPOs.
22   Q    Got it.
23   A    Don't move that position out of corporate
24        accounts.  Just redirect it, reassign it.
25   Q    You're saying, Hey, why don't we do a win/win?
```

Page 32

1   A   Yes.

2   Q   You never went to human resources about the

3       incentive compensation plan from 2000 to 2020?

4   A   Correct.

5   Q   And until the -- I mean, there was never

6       anything beyond that.  We talked about

7       everything as to your complaints internally to

8       Roche under the incentive compensation plan.

9       You have told me the number of years that you

10      can recall that you raised it with your direct

11      manager.  You raised it one time beyond that;

12      right?  We have talked about the one.

13  A   That is correct.

14          MR. CAMPBELL:  Why don't we take a short

15      break.  Why don't we come back at 20 after.

16      Does that work for everybody?  And we'll begin

17      with looking at some of your plans.  Okay?

18          THE WITNESS:  Okay.  Thank you.

19          (A recess was taken between 10:09 a.m. and

20      10:20 a.m.)

21  BY MR. CAMPBELL:

22  Q   So, Mr. Thomson, before we go to the next line

23      of questions, is there anything that you need to

24      supplement before I go on from your first period

25      of answering questions?

Page 33

1    A    No.

2    Q    So let me ask you some -- I'm going to show you

3         some exhibits now.  We're going to go through

4         some of the years on this.  I'm going to, first

5         of all, take you to what's been marked as

6         Exhibit 2.

7              (Deposition Exhibit 2 was presented for

8         identification.)

9    Q    I'm going to show you one of the attachments to

10        your complaint in this matter.

11             Can you see my screen, Mr. Thomson?

12   A    Yes, I can.

13   Q    I'm going to scroll through this just to verify

14        that you see the four pages.

15             What is this document?

16   A    This is the 2018 Incentive Compensation Plan for

17        Group Purchasing Organizations.

18   Q    Okay.  When did you typically receive this

19        document?

20   A    Typically in January.

21   Q    Okay.  January --

22   A    Yeah.

23   Q    I'm sorry.  January of 2018?

24   A    Correct.

25   Q    And you said you had to actually sign off on it?

Page 34

1   A   Yes.  Through the portal.  The learning portal

2       at Roche.

3   Q   You get it through the learning portal.  After

4       you receive this through the learning portal,

5       you would then have communications as a team

6       with your manager; right?

7   A   Well, I just want to be clear about this.  So

8       what we did with the portal was say that we read

9       it, acknowledged it.  You would get it from our

10      manager.

11  Q   Okay.  Then I believe you've already testified,

12      Mr. Thomson, I'm not trying to be difficult, but

13      I believe you testified that then your manager

14      would have communications with you and the rest

15      of the group purchasing organizations team about

16      it?

17  A   Correct.

18  Q   Okay.  And when did those communications

19      typically take place?  January, February?

20  A   It could be before.  Acknowledge that we read

21      it, or it could happen afterwards.

22  Q   When you got your midyear payout, did you meet

23      with your manager?

24  A   Well, when you say meet with them -- so we

25      would -- we typically would get the check,

Page 35

```
 1        figure out how we got paid.  It wasn't always
 2        presented to us.
 3             Then I would reach out to understand why it
 4        was paid out in such a way.
 5    Q   Okay.  So you get -- you would receive your
 6        compensation midyear, and for 2018, was
 7        Mr. Fowler your manager?
 8    A   Yes.  The entire year.
 9    Q   So 2018, you received your midyear compensation.
10        And based on your practice at Roche, you would
11        then reach out to Mr. Fowler to say, Why did I
12        get paid X amount?
13    A   Have you scanned to look at the KSOs?  It has
14        changed over time when things were paid out.  I
15        just want to make sure I'm answering it
16        correctly.  Semiannual; right?  So semiannual on
17        KSOs.  So yes, we would have received a check
18        semiannual.
19    Q   Okay.  You would check with Mr. Fowler in 2018,
20        2019, 2020, 2021, and 2022, A, You paid out
21        blank amount.  Why?
22    A   Yes.
23    Q   Did you follow that same procedure at the annual
24        payout to check with Mr. Fowler in 2018, '19,
25        '20, '21, and '22, to review what you were paid
```

Page 36

```
 1       out?
 2    A  Yes.
 3    Q  Okay.  So you received this.  I take it that if
 4       you received this, certainly if you had
 5       questions about, for example, KSO or anything
 6       like that, you could go to Mr. Fowler or to
 7       Mr. DiNizo or whoever his manager is to ask
 8       questions about it; right?
 9    A  Just to be specific, Ron DiNizo's manager is the
10       CEO of North America.  I probably wouldn't go to
11       him.
12    Q  I was saying Mr. Fowler's manager you could go
13       to; right?
14    A  That is correct.
15    Q  Or you could go to HR if you wanted to say, Hey,
16       I've got questions about my incentive
17       compensation plan; right?
18    A  Correct.
19    Q  I assume you and your co-workers in the group
20       sales organization would be speaking during that
21       time frame as well to say, Hey, what do you
22       think about it, and those types of things;
23       right?
24    A  Yes.
25    Q  And I take it that the plans, they certainly
```

1   changed somewhat each year, but in general,

2   these plans weren't -- I guess they didn't

3   reinvent the wheel every year; right?  They were

4   pretty consistent throughout the course of your

5   20 years under the incentive compensation plan?

6  A   I would not say "consistent."  If you look at

7      the 2018, 80 percent of the payout was based on

8      KSOs.

9  Q   Okay.

10 A   If you look at future years, I think as low as

11     maybe 30 percent were based on KSOs.  To me,

12     that's pretty substantial.

13 Q   From 2018 to 2022, you're saying the percentage

14     of the KSO payout went down?

15 A   Well, it changed.  I don't have it all committed

16     to memory, but they change, which I'm sure we

17     will see.  If you would, it's 80 percent for

18     2018.

19 Q   And I guess I would say that is a change, but my

20     question to you would be although the

21     percentages might be changed and the revenue

22     projections might be changed as to the group

23     points and those types of things, obviously,

24     they are increasing or decreasing based on the

25     market and based on Roche's sales.  But in

Page 38

1      general, the criteria for you to earn your
2      compensation weren't drastically changing over
3      the course of those 20 years that you were on
4      the incentive compensation plan; right?
5   A  Again, it depends how you define "drastically,"
6      but in general, I agree with you.
7   Q  Okay.  So let me take you now to the 2018 -- I'm
8      going to take you now to Deposition Exhibit 1.
9          (Deposition Exhibit 1 was presented for
10     identification.)
11  Q  Can you see my screen?
12  A  Yes.
13  Q  Do you recognize this document, this
14     31-page document?
15  A  Yes.
16  Q  I'm happy -- do you want me to scroll through
17     all the pages?
18  A  Depends on what you're going to ask.  I don't
19     have it committed to memory.  No.
20  Q  Are you familiar with RDC-107?
21  A  Yes.
22  Q  And this is the description for this year, this
23     is what we're looking at, just so we're clear,
24     it was effective February 7, 2018; right?
25  A  Yes.

Page 39

```
 1    Q    And this is the Sales and Service Incentive

 2         Compensation Plan Policy for that time period;

 3         right?

 4    A    Yes.

 5    Q    So this is what that Exhibit 2 is based off of

 6         that I just showed you; right?

 7    A    Yes.

 8    Q    Okay.  If you wanted to take a look at the

 9         actual plan policy, were you looking at RDC-107

10         every year or just some years?

11    A    I would say every year because it's changed

12         periodically.  Probably changed four or five

13         times, yeah.

14    Q    How did it -- I guess I would say how did you

15         have access to it as a Roche employee?  Where

16         did you get access to RDC-107?

17    A    Typically, it would be part of the learning, the

18         learning portal.  You would get an email saying,

19         You need to go out and read and understand this,

20         is how we would get access to it.

21    Q    This is every year that you were under the

22         incentive compensation plan, you would -- on the

23         learning portal, you would get notice of, Here's

24         your plan for the group sales, as well as here's

25         RDC-107 that you should review and acknowledge
```

Page 40

1       receipt of?

2   A   No.  Only when they changed.

3   Q   Only when they changed.  Okay.

4           So if we see each year from 2018 to 2022

5       that RDC-107 changed, you would have gotten it

6       on the learning portal each year?

7   A   Yes.

8   Q   So let's look at this one.  I just want to take

9       you to Section 4 on this document.

10          Section 4, do you see that on my screen?

11  A   Yes.

12  Q   And Section 4, Incentive Plan Payment Review.

13      Did I read that right?

14  A   Yes.

15  Q   This one states, and I'll read it just for the

16      record.  Then I'll ask you some questions.

17          Let me read it first, and I'll ask you some

18      questions.

19          "Employees on ICP" --

20          That's this incentive compensation plan;

21      right?

22  A   Yes.

23  Q   -- "are responsible for reviewing and confirming

24      the accuracy of their commission and bonus

25      payments."

Page 42

1    A    That's not -- go ahead.

2            MS. CONKLIN:  Objection.  Misstates the

3        record.

4            Go ahead, John.

5    A    Yes, I did.

6    BY MR. CAMPBELL:

7    Q    Well, I guess, first of all, I asked you about

8        your complaints, okay, and what you did.  You

9        only met with Jason Fowler's manager on one

10        occasion.  That was 2022; right?

11   A    Correct.

12   Q    Are you saying you submitted this incentive plan

13        payment review, this written discrepancy every

14        year from 2018 to 2022?

15   A    Only 2018 because of, as this says, there was a

16        mistake in the calculation of the payout.

17   Q    I'm not -- let me be clear with you.  Okay?  I'm

18        not looking -- if you want to at the end of your

19        statement explain further and give your argument

20        for it, you're welcome to do that.  Okay?  I

21        don't have any problem with you doing that.  But

22        I'd like you to answer my questions, okay,

23        first.  Because if you don't answer my

24        questions, I just have to ask it two or three or

25        four times to get it, and then we go back and

Page 43

1      forth.  Okay?  Let me ask you first.

2          So from what you just said, 2019, 2020,

3      2021, and 2022, you did not submit this written

4      review; right?

5          I don't think you came through.  I didn't

6      hear you.

7   A  Correct.  Can you hear me?

8   Q  Now, I can hear you.  Okay.  In 2018, you did,

9      and that was due to what?  You said there was a

10     calculation error?

11  A  Yes.

12  Q  Was that corrected?

13  A  Yes.

14  Q  So you didn't in 2018 say, Hey, I don't think I

15     was paid out enough on the KSO, in writing?

16  A  In writing, no.

17  Q  You didn't do that for 2019, 2020, 2021, or

18     2022; correct?

19  A  Well, I would -- I don't believe that's an

20     accurate statement either, as we discussed.

21         Well, I'll leave it there.

22  Q  I didn't ask you whether it was accurate or not.

23     I asked you for an answer.  I think you've

24     already answered it, but please confirm.  You

25     didn't submit this written objection under the

Page 61

```
 1        more than the others.
 2   Q    So you think that you achieved more than your
 3        three co-workers in 2018?
 4   A    Yes.
 5   Q    Now, you had the opportunity when you got paid
 6        your ICO payments, semiannual and annual, you
 7        sat down with Mr. Fowler to discuss it on both
 8        of those occasions; right?
 9   A    Yes.
10   Q    You had the opportunity to say to him, This is
11        how well I did.  I think I performed better than
12        my co-workers.  Right?
13   A    I would say I didn't really position as better
14        than my co-workers.  This is what I
15        accomplished.  Because what my fellow co-workers
16        make is really none of my concern; right?  My
17        concern is how did I do against KSOs that
18        weren't developed.
19   Q    I guess, well, first of all, if the KSOs,
20        Mr. Thomson, weren't developed, and you didn't
21        know what to do, is it your testimony -- let's
22        be clear.  You're a 43-year employee, been a
23        sales employee for every 20 years.  Is it your
24        testimony that you had no idea what it took in
25        order to be a good employee at Roche and to earn
```

Page 62

1      your KSO?  Is that your testimony?

2   A  My testimony is I knew what I had to do to be

3      successful.  There's nothing to measure me

4      against.

5   Q  But my question is, you certainly knew, after 20

6      years as a salesperson, and if you claimed to

7      have known enough how to reconfigure this

8      department to be more profitable, you certainly

9      understood what it took for you to be excelling

10     in your position; right?

11  A  Yes.

12  Q  It wasn't a mystery to you.  You weren't a new

13     employee to sales and needed to be sat down and

14     told, This is what you should be doing every

15     day.  You knew it; right?  Whether Mr. Fowler

16     was your manager, or if Mr. Fowler had been

17     replaced the next day, you knew what your job

18     was, and you knew what it took to be a good

19     Roche employee in your department; right?

20  A  Because we had no KSOs, it was difficult to read

21     Jason's mind to know what he felt was important.

22  Q  Certainly, you had every opportunity to go to

23     human resources or to Mr. Fowler's manager or to

24     anyone else at Roche to say, Look, I believe

25     that after 20 years, I don't know enough to be

Page 63

```
 1        able to determine what it takes to be a good
 2        Roche employee.  I need to have more directive
 3        for that, and I'm complaining about it.  Right?
 4        You knew how to do that?
 5     A  No.  I'm not characterizing my words -- maybe I
 6        could try to explain it again.
 7           I know what it takes to be a good employee.
 8        I do.  I've been very successful for 43 1/2
 9        years.
10           The key sales objectives change over the
11        years.  They are supposed to come from top down.
12        That never happened.
13     Q  Okay.
14     A  What Jason thought was what I should be doing
15        may not align 100 percent with what I thought
16        was important.  I knew how to be a good
17        employee.
18     Q  Okay.  I guess I would say this.  We're sitting
19        here, five years after 2018, with you claiming
20        without any proof; right?  You haven't reviewed
21        Ms. Boik's sales efforts, performance reviews,
22        or anything for 2018; right?
23     A  Correct.
24     Q  You don't have any basis, aside from your own
25        subjective opinion, that you were performing
```

Page 65

```
 1        January 30, 2019; right?
 2   A    That's not accurate, no.
 3   Q    When did you get your payout?
 4   A    It was typically in February.  February 15.
 5   Q    That's even more to my point.  February 15, you
 6        get your payout, you go talk to Mr. Fowler.  By
 7        that time, you had already received the
 8        incentive comp plan and the RDC-107 for the next
 9        year; right?
10   A    Yes.
11   Q    So if we're sitting in February 2019, and you
12        sit down with Mr. Fowler, and he tells you --
13        you were close to a hundred percent in every
14        year aside from 2019; right?
15   A    Yes.
16   Q    He told what you percentage you were paid out;
17        right?
18   A    After I questioned him about, yes.  I can
19        calculate it myself based on my check.
20   Q    So whether you had a question and calculate
21        it -- you knew whether you were at 100 percent,
22        102 percent, or some other number; right?
23   A    Yes.
24   Q    And so if you were paid out 100 percent and felt
25        you should have been paid more, you had every
```

Page 70

```
 1        performance review to human resources, you could
 2        have taken it to Mr. Fowler's manager.  If you
 3        felt it was wrong, you had a variety of ways to
 4        challenge it; right?
 5   A    I did.
 6   Q    And you didn't?
 7   A    For what I considered very good reasons.
 8   Q    What's a good reason that you're filing a
 9        lawsuit four or five years after the fact?  You
10        don't raise anything then, but now you're saying
11        it was a wrong evaluation.  That's what you're
12        saying; right?
13   A    I am.
14   Q    Don't you think that in order to really
15        determine whether that's a proper evaluation or
16        not, that you have to timely say, Hey, I don't
17        agree with this, and HR, can you review it?
18   A    So HR was supposed to sign off on the KSOs;
19        right?  They didn't do it.  Ron DiNizo was
20        supposed to sign off on the KSOs, didn't do it.
21        Jason Fowler never developed them.  It was my
22        opinion I couldn't win because they are all in
23        on it.
24   Q    My question to you was, on the performance
25        evaluation that you said you disagreed with that
```

Page 71

```
 1        Mr. Fowler gave you for 2019, you should have

 2        then went to human resources to say, I disagree

 3        with this.  My performance was much better than

 4        what Mr. Fowler believes.  Right?

 5   A    Could have.  Yes.

 6   Q    Well, I mean, you think that that would be a

 7        more appropriate forum than to, five years

 8        later, raise a lawsuit and subjectively claim

 9        that somehow Mr. Fowler was wrong?

10   A    Disagree with that statement.

11   Q    Okay.  So the payouts on this year, again, it

12        looks like your co-workers were paid out close

13        to a hundred percent, and I believe you were

14        paid out a little under 90 percent; right?

15   A    I believe that to be correct.  Yes.

16   Q    You knew your payout percentage when this was

17        presented to you in February of 2020; correct?

18   A    I knew it when I received my check.

19        February 15.

20   Q    Then you went and met with Mr. Fowler to discuss

21        why you received that percentage payout?

22   A    We had that discussion before that time.  But

23        yes.

24   Q    And if you disagreed with that, you felt that

25        your payout should have been the maximum, you
```

Page 72

```
 1       certainly could have went to human resources or
 2       Jason Fowler's supervisor to raise that
 3       complaint; right?
 4            And you did not?
 5   A   Correct.
 6   Q   Let me take you to Exhibit 13.
 7            (Deposition Exhibit 13 was presented for
 8       identification.)
 9   Q   Let's look at Exhibit 13.  Then Exhibit 13 is
10       the payout for our 2020 ICP; correct?
11   A   There it is.  Yes.
12   Q   Let's look at --
13            Was this your team in 2020?
14   A   Yes, it was.
15   Q   Okay.  Let's look at the KSO payouts.  If we
16       look here, the KSO payouts were you were paid
17       identical aside from one of your co-workers, and
18       it looks like that co-worker was Catherine Boik;
19       correct?
20   A   Correct.
21   Q   And you believe that you outperformed your three
22       other co-workers in 2020?
23   A   I really don't have knowledge enough to answer
24       that question.
25   Q   And Mr. Fowler told you at the end, the
```

Page 74

1      in 2020; right?

2   A  Completely subjective, yes.

3   Q  And if you disagreed with his subjective

4      perception of your performance, you could have

5      went to the human resources department; correct?

6   A  Could have, yes.

7   Q  Could have went to Ron and said, Ron, I think I

8      was outperforming or I could have outperformed

9      had I gotten written KSO prior to just having

10     verbal discussions with Mr. Fowler; right?

11  A  Absolutely.

12  Q  Okay.  And you didn't do that in 2021; right?

13  A  Yes.

14  Q  Okay.  Now let's go to -- let me stop my share.

15     Let's go to our next exhibit, Exhibit 14.

16        (Deposition Exhibit 14 was presented for

17     identification.)

18  Q  I'm going to take you to Exhibit 14.  First of

19     all, for the 2020 payout, was that your team?

20  A  This looks like 2021.

21  Q  That's right.  The 2021 ICP?

22  A  Correct.

23  Q  2021 ICP, it looks like for KSO, you were paid

24     out $30,000 in 2021?

25  A  Correct.

1   Q   And what percentage was that?

2   A   I believe it was 100 percent.

3   Q   Did you -- aside from 2019, did you receive a

4       hundred percent each of the other years?

5   A   I think 2018 was just a hair under and 2022 was

6       just a hair over.  I believe the other ones were

7       100 percent.

8   Q   So a hundred percent, and as to it -- okay.  On

9       this year, it looks like Whitney Johnson and

10      Sonal Patel both earned less than you on the

11      KSO; correct?

12  A   There's a reason for that, but yes.  Whitney

13      Johnson left her position during the year, and

14      Sonal took over her position.  So they were paid

15      based on time in position.

16  Q   Their total for that position is less than

17      yours; right?

18  A   The position -- the territory was open for quite

19      a bit of the year.  Yes.

20  Q   Then we get into Richard and Catherine, and they

21      both earned more than you in 2021; right?

22  A   Yes.

23  Q   How was your performance in comparison to

24      Richard and Catherine in 2021?

25  A   I really don't have enough knowledge to comment.

Page 76

```
 1   Q   And this is the year that you met with
 2       Mr. Fowler.  You talked to Mr. Fowler in
 3       February 2022.  He gave you his reasoning, and
 4       you said in, what, March is when you went to
 5       Ron?
 6   A   Yes.  I believe it was March, yes.  That we had
 7       our Zoom call.
 8   Q   Then March is when you said, I'd like you to --
 9       I think that this department would be better
10       suited if you give me a severance and move my
11       role to a different -- different area, I guess,
12       is what you were saying?
13   A   Yes.
14   Q   Okay.  So now I have to say to you that if they
15       had just had somebody leave -- Whitney had just
16       left the department, and they replaced Whitney
17       with Sonal; right?  During 2021?
18   A   Yes.
19   Q   It would seem that your reasoning was contrary
20       to Ron and Jason's view of the department;
21       right?
22   A   I don't agree with that statement.
23   Q   You don't agree.  Don't you think that if they
24       believed you were right or your reasoning was
25       right, that when Whitney Johnson left, they
```

Page 78

1      in these positions, and have them do more than

2      what we had been -- more than what our

3      accountabilities back then included.

4   Q  Okay.  Let's go to our final exhibit.

5      Exhibit 15.

6          (Deposition Exhibit 15 was presented for

7      identification.)

8   Q  So for the 2022 ICP, were these your co-workers?

9   A  Yes.

10  Q  And the earnings -- let me see, it's a little

11     different here.  What was your payout under the

12     KSO in 2022, the ICP 2022?

13  A  I believe it was 103 percent.

14  Q  103 percent.  Okay.  Do you know where your

15     co-workers fell?

16  A  I know Rick Feid was at 114 percent.

17  Q  Do you know where Sonal and Catherine were?

18  A  No.  But if you -- based on Catherine's payout,

19     she was greater than 115 percent.  Because I

20     believe she --

21  Q  I'm sorry.

22         What column are you looking at?

23  A  Could you keep going?  Is there more?

24  Q  Year-to-date payout?

25  A  No.  This may not have been year end.  Is there

Page 82

1       over if they excelled or under a hundred percent

2       if they had a poor year?  Did you hear that

3       testimony?

4    A  I would agree with that, that I did hear it.

5    Q  You heard it.

6          Certainly -- let me ask you this.  When you

7       were talking to Jason, did he explain to you

8       that mindset of you were earning around a

9       hundred percent and you're doing your job.  If

10      you want to earn higher, this is what you have

11      to do in order to earn higher?

12   A  Disagree with that.  That's why he didn't

13      develop KSOs.  If they had developed KSOs, I

14      would agree with that statement.  Never had

15      those discussions.

16   Q  I guess I would say, sir, the time to say, I

17      don't have a KSO when I want to have it, would

18      presumably be January, February, March, April,

19      May of the year of the compensation plan; right?

20   A  Absolutely.

21   Q  And that's the time when you go to human

22      resources or you go to Ron, and you say, Hey, I

23      would like Jason to give me more specific KSO

24      because even though I've been here, I don't know

25      what Jason might be looking at to be positive,

A No. I disagree with that.
Q What are you saying? I don't understand.
A He had no reason to be upset with me in 2018 for a calculation error that was easily resolved.
Q Okay. I thought you alluded to the 2019 was somehow retaliation? Did I hear you wrong?
A No. No. Future. Beyond 2019. He could take -- he could hurt me financially as he did in 2019, is my point.
Q Okay. So you're not saying he retaliated against you in 2019 for the calculation error that was corrected in 2018?
A That is correct. Yes.
Q You're saying that you understood you could have complained, and you could have asked Ron for more specific KSOs, but you were afraid that Mr. Fowler would somehow retaliate against you?
A Yeah, that was a concern. Absolutely.
Q Okay. You understand that the reason why we have complaint procedures and we say, There's no retaliation; right? You understand that at Roche?
A Sure.
Q They tell you, We give you all these complaint procedures. They don't give you all the

# EXHIBIT 1

## CONFIDENTIAL, FILED UNDER SEAL

# **EXHIBIT 3**

## **CONFIDENTIAL, FILED UNDER SEAL**

# **EXHIBIT 5**

## **CONFIDENTIAL, FILED UNDER SEAL**

# **EXHIBIT 7**

## **CONFIDENTIAL, FILED UNDER SEAL**

# **EXHIBIT 9**

## **CONFIDENTIAL, FILED UNDER SEAL**

| Run Date | Sort By _Dim | Payee ID | Name | Zone Territory | Active Territory | Paid Territory | Business Unit ID | Sales Team | Role ID | Payout Period | ACCEL - GROWTH | BAL PLAN ACCEL - ANNUAL | KSO | | MBO | NEW HIRE P | OPEN TERRITORY | REV ACCEL - QUARTERLY Q | REVENUE - ANNUAL - PROFIT | REVENUE - TOTAL | SPIFF | Current Ne | GRAND TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1/30/2019 14:14 | BOX, CATHERINE | 10039263 | BOX, CATHERINE | Null | GPO30 | GPO30 | CA | CA | CA-NO-GPO | 2018-12 DEC | | | | $42,286.40 | | | | | | $10,400.00 | | | $ 52,686.40 |
| 1/30/2019 14:14 | FEID, RICHARD | 7415 | FEID, RICHARD | Null | GPO20 | GPO20 | CA | CA | CA-NO-GPO | 2018-12 DEC | | | | $42,556.80 | | | | | | $10,400.00 | | | $ 52,956.80 |
| 1/30/2019 14:14 | JOHNSON, WHITNEY | 30088 | JOHNSON, WHITNEY | Null | GPO10 | GPO10 | CA | CA | CA-NO-GPO | 2018-12 DEC | | | | $42,556.80 | | | | | | $10,400.00 | | | $ 52,956.80 |
| 1/30/2019 14:14 | THOMSON, JOHN | 1282 | THOMSON, JOHN | Null | GPO40 | GPO40 | CA | CA | CA-NO-GPO | 2018-12 DEC | | | | $40,726.40 | | | | | | $10,400.00 | | | $ 51,126.40 |

49

| Run Date | SortBy_Dim | Payee ID | Name | Zone Territory | Active Territory | Paid Territory | Business Unit ID | Sales Team | Role ID | Payout Period | ACCEL - GRO BAL PLAN ACCEL - ANNUAL | KSO | H1 KSO Score | H2 KSO Sc | YTD KSO |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1/30/2019 14:14 | JOHNSON, WHITNEY | 30088 | JOHNSON, WHITNEY | Null | GPO10 | GPO10 | CA | CA | CA-ND-GPO | 2018-12 DEC | | $42,556.80 | 100% | 105% | $ 42,556.80 |
| 1/30/2019 14:14 | FEID, RICHARD | 7415 | FEID, RICHARD | Null | GPO20 | GPO20 | CA | CA | CA-ND-GPO | 2018-12 DEC | | $42,556.80 | 100% | 105% | $ 42,556.80 |
| 1/30/2019 14:14 | BOIK, CATHERINE | 10039263 | BOIK, CATHERINE | Null | GPO30 | GPO30 | CA | CA | CA-ND-GPO | 2018-12 DEC | | $42,286.40 | 100% | 103% | $ 42,286.40 |
| 1/30/2019 14:14 | THOMSON, JOHN | 1282 | THOMSON, JOHN | Null | GPO40 | GPO40 | CA | CA | CA-ND-GPO | 2018-12 DEC | | $40,726.40 | 100% | 96% | $ 40,726.40 |

50

| Run Date | SortBy_Dim | Payee ID | Name | Zone Territory | Active Territory | Paid Territory | Business Unit ID | Sales Team | Role ID | Payout Period | ACCEL - GROWTH PLAN ACCEL | BAL KSO | MBO | OPEN TERRITORY | PRIOR YEAR ADJUSTMENTS | REVENUE - ANNUAL | REVENUE - TOTAL NEGATIVE | GRAND TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1/31/2020 16:26 | Bokl, Catherine | 10039263 | Bokl, Catherine | Null | GPO30 | GPO30 | CA | CA | CA-ND-GPO | 2019-12 DEC | | $44,720.00 | | | | $8,450.00 | | $53,170.00 |
| 1/31/2020 16:26 | Feid, Richard | 7415 | Feid, Richard | Null | GPO20 | GPO20 | CA | CA | CA-ND-GPO | 2019-12 DEC | | $41,600.00 | | | ($1,830.00) | $8,450.00 | | $48,220.00 |
| 1/31/2020 16:26 | Johnson, Whitney | 30088 | Johnson, Whitney | Null | GPO10 | GPO10 | CA | CA | CA-ND-GPO | 2019-12 DEC | | $42,224.00 | | | | $8,450.00 | | $50,674.00 |
| 1/31/2020 16:26 | Thomson, John | 1282 | Thomson, John | Null | GPO40 | GPO40 | CA | CA | CA-ND-GPO | 2019-12 DEC | | $37,648.00 | | | $1,040.00 | $8,450.00 | | $47,138.00 |

51

| Run Date | SortBy_Dir | Payee ID | Name | Zone Territ | Active Terr | Paid Territ | Business U | Sales Tear | Role ID | Payout Period | Score |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ######## | Boik, Cath | 10039263 | Boik, Cath | Null | GPO30 | GPO30 | CA | CA | CA-ND-GPO | 2019-06 JUN | 100% |
| ######## | Feid, Richa | 7415 | Feid, Richa | Null | GPO20 | GPO20 | CA | CA | CA-ND-GPO | 2019-06 JUN | 100% |
| ######## | Johnson, V | 30088 | Johnson, V | Null | GPO10 | GPO10 | CA | CA | CA-ND-GPO | 2019-06 JUN | 100% |
| ######## | Thomson, . | 1282 | Thomson, . | Null | GPO40 | GPO40 | CA | CA | CA-ND-GPO | 2019-06 JUN | 100% |

| Position | NCAD/NSSD | CAD/CAM | KSO or MBO | Score |
|----------|-----------|---------|------------|-------|
| CA-ND-GPO | Jason Fowler | Boik, Catherine | KSO CA-ND-GPO | 115.0% |
| CA-ND-GPO | Jason Fowler | Johnson, Whitney | KSO CA-ND-GPO | 102.5% |
| CA-ND-GPO | Jason Fowler | Feid, Richard | KSO CA-ND-GPO | 100.0% |
| CA-ND-GPO | Jason Fowler | Thomson, John | KSO CA-ND-GPO | 81.0% |

| Comp Plan | Territory | Payee | Payee Name | Period | Report Pulled Date | ACCEL - BAL PLAN | ACCEL - GROWTH | KSO | NEGATIVE BALANCE | NEW HIRE PLAN | OPEN TERRITORY | PRIOR BALANCE | PROFIT | REVENUE - COVID-19 - NATL - ANNUAL | REVENUE - TOTAL | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CA-CAD-GPO | A10G01 | 0 | No Employee | 202112 | 1/21/2022 16:10 | $ - | | $ - | | | | | | $ 2,421.92 | $ 5,604.39 | $ 8,026.31 |
| CA-CAD-GPO | A10G01 | 30088 | Johnson, Whitney | 202112 | 1/21/2022 16:10 | $ - | | $ 7,541.44 | | | | | | $ 1,620.55 | $ 7,479.45 | $ 16,641.44 |
| CA-CAD-GPO | A10G01 | 10110496 | Patel, Sonal | 202112 | 1/21/2022 16:10 | $ - | | $ 11,250.00 | | | | | | $ 2,457.53 | $ 11,342.46 | $ 25,049.99 |
| CA-CAD-GPO | A10G02 | 7415 | Feid, Richard | 202112 | 1/21/2022 16:10 | $ 35,000.00 | | $ 35,400.00 | | | | | | $ 6,500.00 | $ 30,000.00 | $ 106,900.00 |
| CA-CAD-GPO | A10G03 | 10039263 | Boik, Catherine | 202112 | 1/21/2022 16:10 | $ 35,000.00 | | $ 40,500.00 | | | | | | $ 6,500.00 | $ 30,000.00 | $ 112,000.00 |
| CA-CAD-GPO | A10G04 | 1282 | Thomson, John | 202112 | 1/21/2022 16:10 | $ - | | $ 30,000.00 | | | | | | $ 6,500.00 | $ 30,000.00 | $ 66,500.00 |

54

| Comp Plan | Component | Territory | Payee | Payee Name | Year-Qtr | Period | Report Pulled Date | H1 Rating | H1 KSO Payout | H2 Ratin | H2 KSO Payout | YTD KSO Payout |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CA-CAD-GPO | KSO | A10G01 | 30088 | Johnson, Whitney | 2021-Q2 | 202106 | 1/14/2022 15:35 | 100% | $ 7,541.44 | | | $ 7,541.44 |
| CA-CAD-GPO | KSO | A10G01 | 1E+07 | Patel, Sonal | 2021-Q4 | 202112 | 1/14/2022 15:35 | 0% | $ - | 100.0% | $11,250.00 | $11,250.00 |
| CA-CAD-GPO | KSO | A10G02 | 7415 | Feid, Richard | 2021-Q4 | 202112 | 1/14/2022 15:35 | 120.0% | $ 18,000.00 | 116.0% | $17,400.00 | $35,400.00 |
| CA-CAD-GPO | KSO | A10G03 | 1E+07 | Boik, Catherine | 2021-Q4 | 202112 | 1/14/2022 15:35 | 150.0% | $ 22,500.00 | 120.0% | $18,000.00 | $40,500.00 |
| CA-CAD-GPO | KSO | A10G04 | 1282 | Thomson, John | 2021-Q4 | 202112 | 1/14/2022 15:35 | 100.0% | $ 15,000.00 | 100.0% | $15,000.00 | $30,000.00 |

| Comp Plan | Component | Territory | Payee | Payee Name | Period | Report Pulled Date | Sum of Variance To Prior Qtr | Quota FY | Actual | Quota | Max. Attainment | TIP | Capped Rate | Capped Earnings | Uncapped Rate | Uncapped Earnings | Ytd Payout | Current Payout |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CA-CAD-GPO | REVENUE - COVID-19 - NATL - ANNUAL | A10G01 | 30088 | Johnson, Whitney | 2E+05 | 1/20/2022 11:06 | 0 | 1 | 1.02 | 1 | 1.02 | 0.249 | 1.3 | $6,500.00 | 1.3 | $6,500.00 | $1,620.55 | $1,620.55 |
| CA-CAD-GPO | REVENUE - COVID-19 - NATL - ANNUAL | A10G01 | 0 | No Employee | 2E+05 | 1/20/2022 11:06 | 1.02 | 1 | 1.02 | 1 | 1.02 | 0.373 | 1.3 | $6,500.00 | 1.3 | $6,500.00 | $2,421.92 | $2,421.92 |
| CA-CAD-GPO | REVENUE - COVID-19 - NATL - ANNUAL | A10G01 | 1E+07 | Patel, Sonal | 2E+05 | 1/20/2022 11:06 | 0 | 1 | 1.02 | 1 | 1.02 | 0.378 | 1.3 | $6,500.00 | 1.3 | $6,500.00 | $2,457.53 | $2,457.53 |
| CA-CAD-GPO | REVENUE - TOTAL | A10G01 | 30088 | Johnson, Whitney | 2E+05 | 1/20/2022 11:06 | 255,281,397.75 | ############ | 475,569,250.92 | 433,445,983.96 | 1.1 | 0.249 | 2 | $30,000.00 | 2 | $30,000.00 | $7,479.45 | $3,708.73 |
| CA-CAD-GPO | REVENUE - TOTAL | A10G01 | 1E+07 | Patel, Sonal | 2E+05 | 1/20/2022 11:06 | 127,793,757.43 | ############ | 475,569,250.92 | 433,445,983.96 | 1.1 | 0.378 | 2 | $30,000.00 | 2 | $30,000.00 | $11,342.46 | $9,446.86 |
| CA-CAD-GPO | REVENUE - COVID-19 - NATL - ANNUAL | A10G02 | 7415 | Feid, Richard | 2E+05 | 1/20/2022 11:06 | 1.02 | 1 | 1.02 | 1 | 1.02 | 1 | 1.3 | $6,500.00 | 1.3 | $6,500.00 | $6,500.00 | $6,500.00 |
| CA-CAD-GPO | REVENUE - TOTAL | A10G02 | 7415 | Feid, Richard | 2E+05 | 1/20/2022 11:06 | 127,793,757.43 | ############ | 475,569,250.92 | 433,445,983.96 | 1.1 | 1 | 2 | $30,000.00 | 2 | $30,000.00 | $30,000.00 | $18,750.00 |
| CA-CAD-GPO | REVENUE - COVID-19 - NATL - ANNUAL | A10G03 | 1E+07 | Boik, Catherine | 2E+05 | 1/20/2022 11:06 | 1.02 | 1 | 1.02 | 1 | 1.02 | 1 | 1.3 | $6,500.00 | 1.3 | $6,500.00 | $6,500.00 | $6,500.00 |
| CA-CAD-GPO | REVENUE - TOTAL | A10G03 | 1E+07 | Boik, Catherine | 2E+05 | 1/20/2022 11:06 | 127,793,757.43 | ############ | 475,569,250.92 | 433,445,983.96 | 1.1 | 1 | 2 | $30,000.00 | 2 | $30,000.00 | $30,000.00 | $18,750.00 |
| CA-CAD-GPO | REVENUE - COVID-19 - NATL - ANNUAL | A10G04 | 1282 | Thomson, John | 2E+05 | 1/20/2022 11:06 | 1.02 | 1 | 1.02 | 1 | 1.02 | 1 | 1.3 | $6,500.00 | 1.3 | $6,500.00 | $6,500.00 | $6,500.00 |
| CA-CAD-GPO | REVENUE - TOTAL | A10G04 | 1282 | Thomson, John | 2E+05 | 1/20/2022 11:06 | 127,793,757.43 | ############ | 475,569,250.92 | 433,445,983.96 | 1.1 | 1 | 2 | $30,000.00 | 2 | $30,000.00 | $30,000.00 | $18,750.00 |

TIP=Time in Position
Covid Revenue was raised to 102% for all employees as forecasting such a large number was difficult to predict

| Comp Plan | Territory | Payee | Payee Name | Period | Report Pulled Date | ACCEL - BAL PLAN | ACCEL - GROWTH | NEW HIRE PLAN | Total |
|-----------|-----------|-------|------------|--------|-------------------|------------------|----------------|---------------|-------|
| CA-CAD-GPO | A10G02 | 7415 | Feid, Richard | 202112 | 1/21/2022 15:35 | $ 35,000.00 | | | $ 35,000.00 |
| CA-CAD-GPO | A10G03 | 10039263 | Boik, Catherine | 202112 | 1/21/2022 15:35 | $ 35,000.00 | | | $ 35,000.00 |